# IN THE SUPREME COURT OF CALIFORNIA

In re KENNETH EARL GAY

on Habeas Corpus.

S130263

Los Angeles County Superior Court

A392702

_____

February 13, 2020

Justice Kruger authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Chin, Corrigan, Liu, Cuéllar, and Groban concurred.

_____

In re GAY

S130263

Opinion of the Court by Kruger, J.

Petitioner Kenneth Earl Gay was convicted of the first degree murder of a police officer and sentenced to death. In an earlier habeas corpus proceeding, we found that Gay's trial counsel had defrauded Gay in order to induce Gay to retain him instead of the public defender, and then had gone on to commit serious errors during the trial's penalty phase that undermined the reliability of the resulting death verdict. We accordingly granted habeas corpus relief and vacated the judgment of death. (*In re Gay* (1998) 19 Cal.4th 771, 780 (*Gay I*).) Now, presented with additional allegations concerning trial counsel's deficient performance during the guilt phase, we consider whether his performance undermined the reliability of the jury's guilty verdict as well.

To address this question, we ordered an evidentiary hearing before a referee. Examining Gay's allegations in light of the extensive hearing record, the referee's findings, and the trial record, we conclude Gay was denied his constitutional right to the assistance of competent counsel at the guilt phase of the trial, just as at the penalty phase. We grant habeas corpus relief and afford the People the opportunity to retry Gay if they so choose.

**I.**

After a joint trial before separate juries in the Los Angeles County Superior Court, Gay and codefendant Raynard Paul Cummings were convicted of the first degree murder of Los Angeles Police Officer Paul Verna. (Pen. Code, § 189.) The juries found, as special circumstances, that defendants knowingly and intentionally killed a peace officer engaged in the performance of his duties (*id.*, § 190.2, subd. (a)(7)) and committed the murder to prevent a lawful arrest (*id.*, § 190.2, subd. (a)(5)). The juries also found that a principal was armed with a firearm (*id.*, § 12022, subd. (a)) and that each defendant personally used a firearm (*id.*, §§ 12022.5, subd. (a), 1203.06, subd. (a)(1)). Each jury returned a death verdict. (*People v. Cummings* (1993) 4 Cal.4th 1233, 1255 (*Cummings*).)[1] As explained further below, Gay's death sentence was later vacated (*Gay I, supra*, 19 Cal.4th at p. 780), and a second death judgment following penalty retrial was overturned on appeal (*People v. Gay* (2008) 42 Cal.4th 1195, 1198 (*Gay II*)). Here, we are concerned solely with the validity of Gay's underlying convictions.

We previously have described the guilt phase evidence at length. (See *Cummings, supra*, 4 Cal.4th at pp. 1257–1270.) We briefly summarize the relevant points here. Early in the

---

[1] Gay also was charged with, and convicted of, 10 counts of robbery (Pen. Code, § 211); two counts of attempted robbery (*id.*, §§ 664, 211); conspiracy to commit robbery (*id.*, §§ 182, 211); and being an ex-felon in possession of a concealable weapon (*id.*, § 12021). On appeal, the weapons possession conviction was upheld, but the remaining robbery-related convictions were all reversed. (*Cummings, supra*, 4 Cal.4th at pp. 1256, 1306–1315.)

evening of June 2, 1983, Officer Verna, on motorcycle patrol, made a traffic stop in a residential neighborhood. The driver was Pamela Cummings.[2] Gay was sitting in the front passenger's seat, while Raynard Cummings was sitting in the backseat. Unbeknownst to Officer Verna, the car was stolen and Gay and Raynard Cummings recently had committed a series of robberies. Pamela stepped out of the car and told Officer Verna she had no driver's license or registration for the car. When Officer Verna returned to the car to ask the occupants for identification, he was shot and fell. One of the occupants then got out of the car and shot the officer several more times. (*Id.* at pp. 1257–1258.) The initial shot would have been fatal on its own, as would most of the subsequent ones. (*Id.* at p. 1267.)

The central issue at trial concerned the identity of the shooter or shooters. The prosecutor maintained that Raynard Cummings had fired the first shot while sitting in the backseat and then passed the gun to Gay, who stepped out of the car and fired the remaining shots at the fallen officer. Gay and Cummings each maintained that the other had fired all the shots. (*Cummings*, *supra*, 4 Cal.4th at p. 1259.) There were numerous eyewitnesses to the incident, but the witnesses' descriptions of this tragic event differed in significant respects.

Pamela was the prosecution's primary witness. She had been charged with special circumstances murder and robbery but pleaded guilty to two counts of robbery and to being an accessory to murder on the condition that she testify truthfully as a prosecution witness. (*Cummings*, *supra*, 4 Cal.4th at

---

[2] To differentiate Pamela Cummings from her husband, Raynard Cummings, we will sometimes refer to Pamela by her first name.

p. 1264, fn. 8.) Pamela testified she was driving a two-door 1979 Oldsmobile Cutlass coupe when Officer Verna stopped her at about 5:40 p.m. (*Id.* at p. 1257.) She stepped out of the car and told Officer Verna she had no driver's license or car registration. She gave him a check-cashing card for identification, which the officer used to complete a field interrogation card. Officer Verna returned to the car and bent down, putting his hands on his knees, leaned into the vehicle, and asked the occupants for identification. Pamela, who was standing near the curb, with the car between herself and the officer, heard a gunshot, saw Officer Verna grab his shoulder, and saw the barrel of a gun pointing straight across the front seat of the car between the head rests. She could not see who held the gun because her husband, sitting in the back, obstructed her view. According to Pamela, Gay then got out of the car, approached Officer Verna, and fired three shots into his back as he attempted to return to his motorcycle. The officer walked back a few feet and then fell to the ground. Gay stood over Officer Verna, shot him two more times, threw the gun on his body, and picked up the officer's gun. Pamela and Gay reentered the car through the driver's side door. Gay drove up the street, but then made a U-turn and returned, stopping by the fallen officer. Gay stepped out and retrieved Pamela's identification card and the murder weapon. (*Id.* at pp. 1258, 1263.) The field interrogation card naming Pamela Cummings was left at the scene.

Pamela also testified that on the night of the murder, Gay and Cummings reenacted the shooting in Gay's home for the benefit of Gay's wife, Robin. Gay extended his arm as if holding a gun and said, " 'Pow, pow, motherfucker. Take this,' " and said that he " 'got him good.' " Cummings used the same words in his reenactment. (*Cummings*, *supra*, 4 Cal.4th at p. 1264.)

Eight additional eyewitnesses testified for the prosecution. Their versions of the events and identification of the shooter or shooters varied. The discrepancies turned in part on the differences in appearance between Gay and Cummings. Gay, who is a biracial man of African-American and Caucasian heritage, is much lighter in complexion than Cummings, who is a darker skinned African-American man. At six feet tall, Gay is six inches shorter than Cummings. On the evening of the murder, Gay was wearing a light gray long-sleeved shirt, while Cummings was wearing a maroon short-sleeved shirt.

Twelve-year-old Oscar Martin was in the front yard of his home when he saw Officer Verna giving Pamela a ticket on the street in front of his house. Oscar went into his house and told his mother, who was in the kitchen, what he had seen. She told him to stay inside. He looked out the living room window and saw the back door of the car open and a person he later identified as Raynard Cummings get out and shoot the officer four times. After the shooting, the man got into the car and drove off. Oscar did not see anyone else in the car. (*Cummings*, *supra*, 4 Cal.4th at p. 1259.)

Oscar's mother, Rosa Maria Martin, did not see the murder. She had gone out and looked down her driveway after Oscar told her that a police officer was giving someone a ticket but saw nothing and went back inside. She then heard at least four gunshots, with a pause between the first one and the others. Oscar came to her and said: " 'They killed him.' " Rosa looked out the living room window and saw a two-door car driving slowly down the street. The driver, whom she identified as Gay, got out, picked up a revolver, and then got back into the car. A woman was in the passenger seat, but Rosa could not tell if

anyone was in the rear seat. (*Cummings*, *supra*, 4 Cal.4th at p. 1260.)

Robert Thompson was on a ladder in front of a house across the street and saw Officer Verna giving a ticket to a woman. Gay was in the front seat of the car and Raynard Cummings was in the rear seat on the passenger side. Thompson looked again when he heard a noise and saw the officer backing away from the driver's side door holding his chest. Cummings was holding a gun in his right hand, which extended out of the car. After the first shot, Thompson jumped off the ladder and tried to hide behind a bush. When he looked again, he saw Gay get out of the front seat with a gun in his hand and walk toward the officer with his arm at full extension pointing the smoking gun at the officer on the ground. Gay stood straddling the officer, who was on his back. Cummings remained in the backseat of the car. (*Cummings*, *supra*, 4 Cal.4th at pp. 1261–1262.)

Gail Beasley's preliminary hearing testimony was admitted at trial. She and another witness, Marsha Holt, had been in Beasley's home across the street from the shooting. Beasley saw Officer Verna stop a car and speak to the driver, Pamela. Beasley looked again when she heard two gunshots and saw a Black man, six feet tall with very light skin and a Jheri curl, hold a gun with his arm extended at a 45-degree angle and shoot the officer four times. Another man was in the backseat. Pamela was still outside the car. (*Cummings*, *supra*, 4 Cal.4th at p. 1263.)

Marsha Holt testified she saw a police officer giving a ticket to Pamela. Holt looked away but turned back when she heard a gunshot and then, after a pause, more shots. She saw

the officer fall and saw the shooter pick up the officer's gun, run back to the car, and drive away. At the preliminary hearing and at trial, Holt identified Gay as the shooter. (*Cummings*, *supra*, 4 Cal.4th at p. 1261.)

Eleven-year-old Shannon Roberts was at a residence two or three houses away and saw Officer Verna giving a ticket to a woman who was standing outside a car. Shannon turned and went down the driveway but turned back when he heard a gunshot. He saw Gay shoot the officer four times. Gay then got into the passenger side of the car, the woman got into the driver's side, and they left. A Black man was in the rear seat. Later, a different car stopped by the officer and the driver got out and picked up the gun. (*Cummings*, *supra*, 4 Cal.4th at p. 1262.)

Rose Marie Perez was a passenger in a car that drove through the intersection at the end of the block where the shooting occurred. She looked up the street and saw Officer Verna falling backwards and a light-skinned Black man, whom she later identified as Gay, coming around the back of a car and walking toward the officer. She did not see anything in his hands. Perez also saw a person seated in the backseat of the car but did not see him leave the vehicle. That person had hair similar to that depicted in a photograph of Cummings. (*Cummings*, *supra*, 4 Cal.4th at p. 1263.)

Shequita Chamberlain was a passenger in a different car that drove through the same intersection. She looked down the street and saw a tall, dark-skinned Black man and a police officer near a parked car and a police motorcycle. She heard a shot and saw the officer fall on his back. The Black man got into the car and drove off. Cummings was not the man she saw,

although their complexions were similar. Gay's complexion was lighter than that of the man she saw. (*Cummings, supra,* 4 Cal.4th at p. 1261.)

The prosecution also offered evidence of statements made by Gay and Cummings while they were in custody awaiting trial. Less than a month after Officer Verna was murdered, Gilbert Gutierrez, in jail on an unrelated murder charge, spoke to both defendants on different occasions about the events. Gay told him that Cummings first shot the officer from the backseat of the car, then got out of the car and shot Officer Verna twice more, after which Cummings emptied the gun. Cummings later told Gutierrez that he, Gay, and Pamela were on their way to get cocaine at the time they were stopped by Officer Verna. When Officer Verna asked him if he had any identification, Cummings said he did, pulled out a .38-caliber revolver, and shot the officer in the shoulder. Cummings told Gutierrez that he then got out of the car from the driver's side, shot the officer twice in the back, and then emptied the gun, saying: " 'Here's your identification, motherfucker.' " (*Cummings, supra,* 4 Cal.4th at p. 1264.) Gutierrez testified that Cummings was proud of shooting Officer Verna and bragged about it. Cummings told Gutierrez that he had thrown his gun down and picked up the officer's gun, and that Gay had recovered the gun used by Cummings when they went back. (*Id.* at pp. 1264–1265.)

Deputy Sheriff Rick McCurtin testified that in April 1984, he was on guard duty while Cummings and other inmates were in the jail shower. As another deputy walked by, "inmate Brooks said, 'There is Paul Verna,' after which Brooks and Cummings extended their right arms as if shooting a pistol and said 'Pow, Pow.' Cummings then said to [Deputy] McCurtin: 'Let me show

you how it was done.  This is how it was done.  First two in the back.  Pow, pow.  Walked up and four more.  Pow, pow, pow, pow.'  Cummings's arm was then pointing down at the ground.  On cross-examination[,] the witness quoted defendant Cummings as having said:  'Then *we* put four more.'  (Italics added.)"  (*Cummings*, *supra*, 4 Cal.4th at pp. 1265–1266.)

Deputy Sheriff David LaCasella testified that in April 1985, he escorted defendants from the courtroom to the main lockup.  The coroner had just testified about the postmortem examination of Officer Verna, explaining that he had numbered the bullet wounds in the order he examined them from one through six.  The coroner stated that the first shot fired was " 'Number 6.' "  (*Cummings*, *supra*, 4 Cal.4th at p. 1258.)  Deputy LaCasella placed Cummings and Gay in adjacent cells.  "He later heard Cummings yell:  'You know how he got number six[,] don't you?'  Gay then replied:  'Number six?'  Cummings said 'yeh,' and then yelled:  'That's the one I put in the motherfucker.' "  (*Id.* at p. 1266.)

Deputy Sheriff Michael McMullan testified that about a year after the murder, he and Sergeant George Arthur were escorting Cummings in the central jail when other inmates began chanting " 'dead man walking' " as Cummings passed by.  (*Cummings*, *supra*, 4 Cal.4th at p. 1265.)  Cummings responded by saying:  " 'I am no ghost.  The only ghost I know is Verna.  I put six in him.' "  (*Ibid.*)  As he was put in his cell, Cummings said to Sergeant Arthur:  " 'He took six of mine . . . .  If I see you all on the streets I hope you are quicker than Verna.' "  (*Ibid.*)

In defense, Gay argued that Cummings alone had shot Officer Verna.  In support of this defense, Gay recalled some of the prosecution's eyewitnesses as defense witnesses.  Rosa

Maria Martin again testified that, after the shooting, she saw a car being driven toward the fallen officer. Gay left the car, picked up a gun, reentered the car, and drove it away. She did not see Gay shoot anybody. Rose Marie Perez testified that as she passed through a nearby intersection, she saw Gay walk around the rear of the stopped automobile. At that time, the officer was already falling down. Perez did not see anything in Gay's hand. (*Cummings*, *supra*, 4 Cal.4th at p. 1269.)

Gay also recalled Pamela Cummings as a witness. She testified that she was sure a shot had been fired from within the car. Gay's counsel attempted to impeach her by eliciting an admission that she had lied in prior statements about the murder, by asking her about testimony by other eyewitnesses that was inconsistent with hers, and by posing questions designed to undermine the credibility of her description of the events and to suggest that she was not truthful in stating that she did not know who fired the first shot. Counsel for Cummings then elicited further testimony on cross-examination that Pamela saw Gay slide across the front seat of the car, come out firing a gun, and repeatedly shoot the victim. (*Cummings*, *supra*, 4 Cal.4th at pp. 1269–1270.)

## II.

This court affirmed the murder convictions and judgments of death on automatic appeal. (*Cummings*, *supra*, 4 Cal.4th at p. 1343.) While that appeal was still pending, Gay filed his first petition for a writ of habeas corpus. Among other claims, Gay argued that the judgment should be vacated because he had received constitutionally ineffective representation from his trial counsel, Daye Shinn. We issued an order to show cause

10

why relief should not be granted, limited to a claim of ineffective assistance at the penalty phase.

Following a reference hearing, we granted the petition for a writ of habeas corpus and ordered a new penalty phase trial. (*Gay I*, *supra*, 19 Cal.4th at p. 780.) In granting relief, we held that Shinn had rendered deficient performance by inducing Gay to admit to having committed several robberies—admissions that were used against him at the penalty phase—while presenting "little mitigating evidence" even though "much more potentially mitigating evidence was easily accessible." (*Id.* at p. 794.)

These deficiencies, we explained, could be traced in part to serious misconduct in the very foundation of the attorney-client relationship. The referee concluded that Shinn—who would later be disbarred for misappropriation of client funds in an unrelated matter (*Gay I*, *supra*, 19 Cal.4th at p. 780, fn. 5)—had used fraudulent means to induce Gay to retain him as his attorney. Visiting Gay in county jail, Shinn and an associate, Marcus McBroom, urged Gay to hire Shinn, promising that a group of unidentified (and, in truth, nonexistent) Black businessmen would pay his legal fees. Shinn later directed Gay to tell the court—falsely—that his parents had paid a retainer to Shinn and would pay his legal fees. (*Id.* at pp. 781, 794.) Shinn engaged in these machinations in order to engineer his eventual appointment by the court. (*Id.* at p. 794.)

McBroom was an assistant to Dr. Fred Weaver, a psychiatrist whom Shinn hired to examine Gay's mental health. (*Gay I*, *supra*, 19 Cal.4th at pp. 783, 795–797.) We concluded that "Shinn did not select Dr. Weaver because of his demonstrated competence," but because "Shinn, McBroom, and

Weaver had a capping relationship pursuant to which Weaver was retained in cases in which McBroom had arranged representation by Shinn." (*Id.* at p. 796.) Dr. Weaver accepted the assignment "only with the understanding that the case would not be complicated and would not place demands on his time." (*Id.* at p. 828.) Shinn did not undertake, nor did he direct Dr. Weaver to undertake, "the type of penalty phase investigation and preparation expected of competent professionals in a capital case," including a thorough assessment of Gay's mental health. (*Id.* at p. 796.)

Finally, we noted that "at the time Shinn represented petitioner, Shinn labored under [an] undisclosed potential conflict of interest—he was being investigated for misappropriation of client funds by the office of the same district attorney who was his adversary in the prosecution of petitioner." (*Gay I, supra*, 19 Cal.4th at p. 828.) While the record did not reveal whether Shinn was influenced by this "distraction," we noted that the potential conflict "contribute[d] to our lack of confidence in the verdict when considered with Shinn's other failings." (*Ibid.*)

We summarized our conclusions as follows: "We are unable to put confidence in a verdict of death rendered by a jury that reaches a death penalty verdict for a defendant represented by an attorney who has defrauded the court in seeking appointment, and whose unethical conduct led directly to the retention of a mental health expert who the attorney agreed would not be called upon to do a thorough assessment of the defendant and who testified that the defendant had a sociopathic personality. Confidence in the verdict is further undermined by counsel's incompetent conduct contributing to the penalty phase jury's consideration of evidence that the

defendant is a serial robber with a sociopathic personality, and by recognition that the jury did not have the opportunity to consider a substantial amount of mitigating evidence that competent counsel would have presented. We conclude there is a reasonable probability that absent counsel's numerous failings and the conflicts of interest with which he was burdened, a different penalty verdict would have been reached. We do not, therefore, have confidence in the penalty verdict reached in this case." (*Gay I*, *supra*, 19 Cal.4th at pp. 829–830, fn. omitted.)

Following a penalty phase retrial, Gay was again sentenced to death in 2000. (*Gay II*, *supra*, 42 Cal.4th at p. 1198.) On appeal, we again reversed the death judgment, this time because the trial court had erred in preventing the defense from presenting, and the jury from considering, evidence that Gay was not the shooter. The improperly excluded evidence included testimony from four children who were eyewitnesses to the shooting—the prosecution had objected on the grounds the children had not been called to testify at the guilt phase of the trial—as well as various statements Cummings made in which he claimed to be the sole shooter. (*Id.* at pp. 1214–1216, 1227.) The court's errors, we ruled, prejudiced Gay by hampering his ability to argue to the jury that it should consider lingering doubt as to guilt as a mitigating circumstance. (*Id.* at pp. 1226–1227.)

On December 28, 2004, while the automatic appeal from the second judgment of death was still pending, Gay filed this petition for a writ of habeas corpus challenging his convictions

and related findings.[3] Gay raised 26 claims for relief, including claims that he is actually innocent of capital murder and that he received ineffective assistance of counsel at the guilt phase of his original trial. We issued an order to show cause why Gay was not entitled to habeas corpus relief from his underlying murder conviction because defense counsel Shinn had failed to adequately investigate and present evidence at the guilt phase of the trial, among other failings, and also had had a conflict of interest that prejudicially affected his representation at the guilt phase. At the request of both parties, we issued a stay of a further penalty phase retrial pending our resolution of these issues.

Following the filing of a return and traverse, we ordered the Los Angeles County Superior Court to select a judge to act as a referee and conduct a hearing to take evidence and make findings of fact on the following questions:

"1. What actions did petitioner's trial counsel, Daye Shinn, take to investigate a defense at the guilt phase of petitioner's capital trial that petitioner did not participate in the murder of Officer Verna? What were the results of that investigation?

---

[3] The procedural bar against successive habeas corpus petitions does not apply here because Gay's first petition was filed before our decision in *In re Clark* (1993) 5 Cal.4th 750, 769–774, in which we clarified that the successiveness bar is nondiscretionary. Before *Clark*, Gay would not have been on notice that failure to raise issues in his first petition would necessarily preclude their later consideration. (See *In re Robbins* (1998) 18 Cal.4th 770, 788, fn. 9 ["*Clark* serves to notify habeas corpus litigants that we shall apply the successiveness rule when we are faced with a petitioner whose prior petition was filed after the date of finality of *Clark*"].)

"2.  What additional evidence supporting that defense, if any, could petitioner have presented at the guilt phase of his capital trial?  What investigative steps, if any, would have led to this additional evidence?

"3.  How credible was this additional evidence?  What circumstances, if any, weighed against the investigation or presentation of this additional evidence?   What evidence rebutting this additional evidence reasonably would have been available to the prosecution at trial?

"4.  Did the Los Angeles County District Attorney's investigation of allegations that petitioner's trial counsel, Daye Shinn, had engaged in acts of embezzlement unrelated to petitioner's case give rise to a conflict of interest in petitioner's case?  If so, describe the conflict of interest.

"5.  If this conflict of interest existed, did it affect trial counsel Daye Shinn's representation of petitioner?  If so, how?"

Superior Court Judge Lance Ito was appointed as referee and held an evidentiary hearing.  Shinn, who had died in 2006, did not testify at the hearing.  After the hearing, Judge Ito filed a 75-page report containing findings of fact.  Gay filed extensive exceptions to the report.  The Attorney General did not take issue with any findings relevant to our disposition of the case.

## III.

### A.

Because a petition for a writ of habeas corpus is a collateral attack on a presumptively final criminal judgment, Gay bears the burden of proving his entitlement to relief by a preponderance of the evidence.  (*In re Cowan* (2018) 5 Cal.5th 235, 243; *In re Price* (2011) 51 Cal.4th 547, 559.)  The referee's

factual findings are "entitled to great weight where supported by substantial evidence." (*In re Hamilton* (1999) 20 Cal.4th 273, 296; accord, *In re Welch* (2015) 61 Cal.4th 489, 501.) Those findings are not, however, conclusive, and "we can depart from them upon independent examination of the record even when the evidence is conflicting." (*Hamilton*, at p. 296; accord, *Cowan*, at p. 243.) The ultimate responsibility for determining whether Gay is entitled to relief rests with this court. (*In re Thomas* (2006) 37 Cal.4th 1249, 1256–1257.)

Gay argues that Shinn rendered ineffective assistance at the guilt phase, in violation of his rights to the assistance of counsel under the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution. "An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." (*Wiggins v. Smith* (2003) 539 U.S. 510, 521; accord, *Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) Whether counsel's performance was deficient, and whether any deficiency prejudiced defendant, are mixed questions of law and fact subject to our independent review. (*In re Thomas, supra,* 37 Cal.4th at p. 1256.)

We evaluate Shinn's guilt phase performance according to well-established standards. "Representation of a criminal defendant entails certain basic duties. Counsel's function is to assist the defendant, and hence counsel owes the client a duty of loyalty . . . . Counsel also has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." (*Strickland, supra,* 466 U.S. at p. 688.) "These basic duties neither exhaustively define the obligations of counsel nor form a checklist for judicial evaluation of attorney

performance." (*Ibid.*) Rather, "[t]o establish deficient performance, a petitioner must demonstrate that counsel's representation 'fell below an objective standard of reasonableness,'" as measured by "'prevailing professional norms.'" (*Wiggins v. Smith, supra,* 539 U.S. at p. 521, quoting *Strickland,* at p. 688.) When applying this standard, we ask whether any reasonably competent counsel would have done as counsel did. (*In re Reno* (2012) 55 Cal.4th 428, 465.) Counsel's performance "is assessed according to the prevailing norms at the time." (*In re Thomas, supra,* 37 Cal.4th at p. 1257.) Judicial review of counsel's performance is deferential; to establish deficient performance, the defendant "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" (*Strickland,* at p. 689.)

As Gay notes, we have already found that Shinn failed in his most basic duty, loyalty to his client, having defrauded Gay in order to induce him to discharge the public defender and retain Shinn instead. (*Gay I, supra,* 19 Cal.4th at pp. 794–795, 828–829.) But according to Gay, that is not all; Shinn's lack of professionalism pervaded the entire course of his pretrial investigation and advocacy. Among other purported shortcomings in Shinn's representation, Gay points to Shinn's decision to have Gay confess to involvement in the string of robberies, which we have already found to constitute deficient performance in *Gay I.* (*Gay I, supra,* 19 Cal.4th at pp. 791–794.) Gay also argues that Shinn failed to conduct any meaningful investigation to identify, and thus failed to present, numerous witnesses who could have greatly strengthened Gay's argument that Cummings was solely responsible for the murder of Officer Verna. We conclude Shinn was deficient in every regard.

## B.

Before trial, Shinn formed a plan to have Gay take a polygraph test from the prosecution's expert polygraph examiner. Shinn's apparent hope was that if Gay passed, he would be permitted to testify as a prosecution witness implicating Cummings and would be offered a favorable plea bargain. The prosecution offered no deal but instead required as a condition of any examination that Gay first meet with the prosecutor, a prosecution investigator, Jack Holder, and a detective investigating the Verna murder, John Helvin. (*Cummings*, *supra*, 4 Cal.4th at pp. 1315–1316.)

In advance of the meeting, Shinn advised Gay to admit participation in the string of robberies preceding the Verna murder. Gay followed this advice. At the beginning of the interview, Gay was told that anything he said could and would be used against him. Gay and Shinn each expressly confirmed that no deal was in place and nothing had been promised in exchange for Gay's participation in the interview. Then, as recommended by Shinn, Gay admitted collaborating with Cummings in a series of five armed robberies. (*Cummings*, *supra*, 4 Cal.4th at pp. 1316–1317.) Gay's taped confessions were played for the jury as part of the prosecution's case. (*Id.* at p. 1315; *Gay I*, *supra*, 19 Cal.4th at p. 781.)

On direct appeal, Gay challenged Shinn's conduct in advising him to confess, and later eliciting testimony that the confessions were truthful, as deficient. We found the claim moot as to the robbery charges and did not expressly address it in connection with the murder charge. (*Cummings*, *supra*, 4 Cal.4th at p. 1341.) In resolving Gay's first habeas corpus petition, however, we reached the merits and concluded Shinn

performed incompetently. (*Gay I*, *supra*, 19 Cal.4th at pp. 791–794.)

That conclusion remains sound. Shinn had Gay waive his right against self-incrimination and confess to a series of armed robberies. He told Gay that if the prosecution did not agree to have Gay testify on the state's behalf, these statements would not be used, despite the fact no agreement to that effect had been reached. At a hearing outside the jury's presence, Gay testified that he disregarded the warning that his statements could be used against him because he believed his attorney's contrary assurances. The confessions allowed Gay's own words to be used by the prosecution to establish that Gay and Cummings were crime partners, and that each had an equal motive to avoid capture and arrest by a police officer, and thus equal motive to shoot Officer Verna. "Shinn not only acted as a second prosecutor by creating the evidence that led to petitioner's conviction of the robberies, his conduct permitted the prosecutor to portray petitioner as an admitted serial robber who killed a police officer to avoid arrest and prosecution for the robberies." (*Gay I*, *supra*, 19 Cal.4th at p. 793.)

Though Shinn may have hoped the prosecution would eventually offer a deal, Gay's "statement was not made in the course of plea negotiations, but as a precondition to initiation of any discussion of disposition of the charges." (*Cummings*, *supra*, 4 Cal.4th at p. 1318.) Shinn persuaded Gay to confess by assuring him his statements would not be used unless a deal was struck but had no such agreement with the prosecution. During a hearing on the admissibility of his confession, Gay learned for the first time there was no agreement that would protect him. Under examination by his own counsel, Gay testified: "I don't feel I was tricked by [the prosecutor]. . . . [¶]

I was tricked by you, I feel." No competent and loyal counsel would have deceived his own client, as Shinn did. Nor would competent counsel have allowed a client to be interviewed in the fashion Shinn permitted, following an express advisement that any statements could be used in court, without any agreement in place to protect the client. (*Gay I*, *supra*, 19 Cal.4th at pp. 791–793; see 1 Amsterdam, Trial Manual for the Defense of Criminal Cases (4th ed. 1984) § 213(C), p. 1-245 [describing understanding that counsel should exercise caution before allowing client "to divulge[] any incriminating information to anyone"].)

Consistent with *Gay I*, we conclude Shinn's decision to have Gay confess to the series of robberies fell well below prevailing professional norms.

## C.

We next turn to the central focus of Gay's present claim. To make out Gay's defense at trial, Shinn relied largely on the prosecution's witnesses, who collectively provided only limited help to the theory of the defense. Gay argues Shinn took this tack not for lack of better options, but simply because he failed to conduct an adequate investigation into potential witnesses who might have provided much more helpful testimony. As a consequence, Shinn failed to introduce significant testimony that would have raised doubts about Gay's guilt. Although Gay identifies numerous witnesses he claims a competent attorney would have called, including various types of expert and lay witnesses, we focus our attention on two particular categories: (1) eyewitnesses to the shooting who could have described the shooter in terms that tended to support Gay's theory that Cummings, not Gay, fired all the fatal shots; and (2) peace

officers who could have testified to Cummings's admissions of guilt. For purposes of our inquiry, these two categories of witnesses are enough.[4]

Whether Shinn's failure to call particular witnesses was deficient, and whether his investigation before trial was deficient, are legally intertwined, and so we must consider them together. " '[B]efore counsel undertakes to act, or not to act, counsel must make a rational and informed decision on strategy and tactics founded upon adequate investigation and preparation.' " (*In re Thomas, supra,* 37 Cal.4th at p. 1258, quoting *In re Marquez* (1992) 1 Cal.4th 584, 602.) "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy

---

[4] We considered the same two categories of witnesses in our decision invalidating the outcome of the penalty retrial, at which these witnesses' testimony had been improperly excluded. (*Gay II, supra,* 42 Cal.4th at pp. 1214–1218, 1223–1224.) We explained there that "[e]vidence indicating that defendant was not the actual shooter would have been important to the jury in assessing the appropriate penalty"; the testimony of those who identified Cummings as the sole shooter, and those who heard Cummings admit to being the sole shooter, might well have altered the jury's decision. (*Id.* at p. 1227.)

measure of deference to counsel's judgments." (*Strickland*, *supra*, 466 U.S. at pp. 690–691; accord, *In re Thomas*, at p. 1258.)

## 1.

During the shooting, Ejinio Rodriguez was at the same location as Shannon Roberts, who testified for the prosecution. In a 2003 statement to a defense investigator, Ejinio[5] said he had been playing in his front yard when he noticed a police officer making a traffic stop of a car containing a woman and two men. Ejinio later heard what he initially thought were firecrackers. He saw one of the men, whom he believed was the shooter, standing over the officer while the other man remained in the car. The men and woman drove off but made a U-turn and returned to the fallen officer. The other man then got out of the car and retrieved the officer's gun. Ejinio described the shooter as "a black man who had dark skin and was wearing a dark shirt." Ejinio described the nonshooter who picked up the gun as having "much lighter skin." The referee found that this description "points more strongly towards Raynard Cummings than petitioner" as the shooter based on their respective complexions and clothing.

Ejinio's 14-year-old sister, Irma, was also in the front yard of their house when the officer was shot. The next day, she described the shooter to a police officer "as a dark skinned male negro, about twenty-five years old with a three[-] to four[-]inch afro." According to Irma, the shooter was the driver of the car and was "black and very tall. The passenger seated next to the

---

[5] We sometimes refer to Ejinio and his sister Irma Rodriguez (discussed below) by their first names to avoid confusion.

driver was a lighter skinned person . . . ." Like Ejinio, Irma described the car driving off, then returning and the light-skinned passenger getting out to retrieve a gun. The referee found that Irma's description of the shooter "point[s] more strongly towards Raynard Cummings . . . , with the added fact that she differentiates between the shooter and a lighter complexion male Negro wearing the white long sleeved shirt as the front seat passenger."

The referee found that Shinn read the police investigation file. Irma's name, address, and witness statement were provided in that file. Ejinio was mentioned in the file as having been present during the shooting and was also identified in the grand jury testimony of Shannon Roberts, with whom he had been playing. Despite this, the referee found Ejinio was never interviewed before the 1985 trial. It likewise appears undisputed that the defense never interviewed Irma. Evidence at the reference hearing helps to explain why. The referee's findings and the testimony of Shinn's investigator, Douglas Payne, establish that Payne spent parts of three days in January 1985 seeking out eyewitnesses. Payne confirmed that this investigation resulted from directions he received around Christmas 1984 to canvas the area near the murder scene for witnesses. By the time Payne conducted his investigation, 19 months had elapsed since the murder, jury selection was well underway, and opening statements were only a month away.

As with other aspects of performance, we measure the sufficiency of an attorney's investigation according to the prevailing norms at the time. (See *Rompilla v. Beard* (2005) 545 U.S. 374, 387; *In re Thomas, supra*, 37 Cal.4th at p. 1262.) In the early 1980s, the "American Bar Association Standards for Criminal Justice published at the time described the duty to

investigate this way: 'It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore *all avenues* leading to facts relevant to the merits of the case and the penalty in the event of conviction.' " (*In re Thomas*, at p. 1262, quoting 1 ABA Stds. for Crim. Justice (2d ed. 1982 supp.) std. 4-4.1.)[6] Consistent with the ABA standards, a contemporaneous treatise stresses the importance of a *timely* investigation: "[D]efense investigation should begin promptly. Speed may not be essential in a particular case, but counsel cannot know this until s/he learns something about the case. Generally, speed *is* essential. Physical facts change. An object of importance may be discarded. Witnesses may disappear or forget." (1 Amsterdam, Trial Manual for the Defense of Criminal Cases, *supra*, § 108, p. 1-116; see *Kayer v. Ryan* (9th Cir. 2019) 923 F.3d 692, 714–715 [holding that defense counsel's delay in conducting a capital case investigation may constitute ineffective assistance].)

Shinn's investigator agreed that Shinn was "going through the motions." Shinn's apparent decision to wait until the last minute before having his investigator seek out exculpatory eyewitness accounts cannot be reconciled with prevailing norms. Shinn's trial strategy included relying on percipient eyewitnesses who said Cummings was the shooter. (See *In re Lucas* (2004) 33 Cal.4th 682, 725 [the reasonableness of any limits on investigation should be evaluated in light of counsel's strategy].) Shinn was retained in August 1983; his

[6] Both the United States Supreme Court and this court have treated those standards as persuasive evidence of prevailing professional norms. (See *Rompilla v. Beard, supra,* 545 U.S. at p. 387; *Wiggins v. Smith, supra,* 539 U.S. at p. 524; *In re Thomas, supra,* 37 Cal.4th at p. 1262.)

investigator began working for him no later than May 1984. Long before January 1985, one month before opening statements, Shinn could and should have had his investigator seek out eyewitnesses to determine whether they would testify favorably and to preserve their recollections. We conclude Shinn was deficient for not investigating in a timely fashion the availability of favorable eyewitness testimony.

The referee's findings identify two reasons competent counsel might have ultimately hesitated to call Ejinio as a witness after interviewing him and learning that his account of the shooting was consistent with Gay's defense. First, Ejinio was young—"about to turn nine" at the time of the shooting.[7] Second, Ejinio was emotionally affected by the shooting. The referee found that when Ejinio testified at the reference hearing more than 30 years later, he was "anxious and distressed"; even after so much time, "the events of June 1983 were still very upsetting to him." The referee noted that the child's parents had been reluctant to permit his older sister, Irma, to be involved in the police investigation and found it likely "they would have [had] a similar reluctance on behalf of the younger Ejinio."

The referee's findings, which we accept, show there are reasons why competent counsel might reasonably have decided not to call Ejinio as a witness after interviewing him. But Shinn never met with Ejinio, directly or through an investigator, and

---

[7] The referee further found that had Ejinio testified, the trial court would likely have instructed the jury with CALJIC No. 2.20.1, an instruction governing the evaluation of testimony by witnesses 10 years old or younger. Gay takes exception to this finding because the instruction was not promulgated until 1986, after Gay's trial in 1985. The Attorney General does not dispute this point, and we do not adopt this finding.

so neither learned what Ejinio might say nor placed himself in a position to make an informed tactical decision concerning whether potential drawbacks to calling Ejinio might outweigh the benefits. "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." (*Strickland, supra,* 466 U.S. at pp. 690–691.) Shinn's failure to call Ejinio as a witness cannot be accepted as a legitimate tactical choice because, under prevailing norms, his failure promptly to seek out and interview witnesses such as Ejinio was not the product of a reasonable professional judgment. (See *Wiggins v. Smith, supra,* 539 U.S. at pp. 522–523.)

When "counsel were not in a position to make a reasonable strategic choice as to whether to" present evidence "because the investigation supporting their choice was unreasonable" (*Wiggins v. Smith, supra,* 539 U.S. at p. 536), a court must consider whether there is "a reasonable probability that a competent attorney . . . would have introduced" the evidence the attorney's inadequate investigation failed to unearth (*id.* at p. 535). Here, eyewitness testimony was critical to the jury's decision about the identity of the shooter or shooters. And young witnesses were already a feature of this trial: The prosecution relied in part on the eyewitness testimony of 12-year-old Oscar Martin and 11-year-old Shannon Roberts. (*Cummings, supra,* 4 Cal.4th at pp. 1259, 1262.)[8] In these circumstances, there is a

---

[8] Our previous opinion indicated Roberts was 13. (*Cummings, supra,* 4 Cal.4th at p. 1262.) Reexamination of the record confirms that while Roberts was 13 at the time of trial, he was 11 at the time of the shooting, the relevant benchmark for comparative purposes.

reasonable probability that competent counsel, having conducted an adequate investigation, would have presented Ejinio's testimony to bolster Gay's case that Cummings was the lone shooter. The uninformed failure to call Ejinio was deficient, and we must consider whether that deficiency prejudiced the defense, a subject we will address below. (See *Wiggins*, at pp. 535–536.)

Similar considerations come into play when evaluating Shinn's failure to interview or call as a witness Irma. The Attorney General argues it was reasonable for Shinn not to call her because he had been unable to interview her before trial. But the reason Shinn did not interview Irma before trial is that he did not make a timely effort to do so. Shinn's belated investigation of potential eyewitnesses is no justification for not presenting potentially exculpatory evidence. It is, rather, a mark of counsel's unprofessional performance. (See *Wiggins v. Smith*, *supra*, 539 U.S. at pp. 522–523, 527–528; *Strickland*, *supra*, 466 U.S. at pp. 690–691.)

The referee identified two additional considerations that could have weighed against calling Irma to testify. Like Ejinio, she was affected by witnessing the shooting. The referee found her emotional state was heightened by the fact that she was pregnant at the time. And while she was older than her brother, her contemporaneous description of the shooting contained several discrepancies when compared with the testimony of other witnesses that might have been fodder for impeachment on cross-examination. Irma told police the day after the shooting that the "driver punched the officer in the face and pulled the officer's gun from its holster and shot the officer in the neck. The driver then shot the officer two more times and the officer fell backwards. As the car was leaving someone

27

inside the car threw the gun out of the passenger side window, and it landed three feet away from the officer lying on the ground." The referee concluded: "While her descriptions of the shooter as a dark complected male Negro and the light skinned passenger are helpful to petitioner, her recollection of events is largely inconsistent with that of the other witnesses. These discrepancies call into question the value and weight of her testimony."

Again, competent counsel, having interviewed Irma, might have chosen not to call her. But Shinn never met with Irma and so could not have made a strategic judgment that her testimony would have hurt more than it would have helped. (Cf. *Burger v. Kemp* (1987) 483 U.S. 776, 794 [defense strategy "supported by reasonable professional judgment" where counsel at least "interview[ed] all potential witnesses who had been called to his attention"].) Certainly, inconsistencies did not prevent the prosecution from relying on the testimony of eyewitnesses (even children), or the jury from crediting such testimony. (See *Cummings*, *supra*, 4 Cal.4th at pp. 1260–1263 [discussing the many internal discrepancies in the testimony of the prosecution's eyewitnesses].) As with Ejinio, there is a reasonable probability competent counsel would have called Irma, and so we must consider as part of the prejudice flowing from Shinn's limited investigation the impact of her potential testimony. (See *Wiggins v. Smith*, *supra*, 539 U.S. at p. 536.)

**2.**

During the guilt phase trial, Los Angeles County Sheriff's Deputy Michael McMullan testified that he and Sergeant George Arthur were escorting Cummings when he admitted killing Officer Verna, saying: " 'I put six in him.' " (*Cummings*,

*supra*, 4 Cal.4th at p. 1265.) Another sheriff's deputy, Rick McCurtin, testified that on a separate occasion he overheard Cummings tell another inmate that he had shot Officer Verna twice in the back, adding: " 'Then *we* put four more.' " (*Id.* at p. 1266.) Deputy Sheriff David LaCasella testified that Cummings admitted to putting the first shot in Officer Verna. (*Ibid.*) While this testimony inculpated Cummings, Gay argues that Shinn should have called additional sheriff's deputies who heard Cummings confess that he alone killed Officer Verna and who could have exculpated Gay. We consider two potential witnesses, Deputies William McGinnis and Richard Nutt.

In October 1984, Deputy McGinnis was escorting Cummings when Cummings became upset with McGinnis and threatened him. When McGinnis told Cummings that at least he, McGinnis, had never shot anyone in the back, Cummings responded: " '[w]ell, I put two in front of the motherfucker, and he wouldn't have got three in the back if he hadn't turned and ran, coward punk-ass motherfucker.' " (*Gay II*, *supra*, 42 Cal.4th at p. 1214.) McGinnis recorded this statement the same day in a report he submitted to the prosecutor, which was disclosed to Shinn in discovery. McGinnis also testified to the conversation during an Evidence Code section 402 hearing outside the presence of the jury, during which Cummings sought unsuccessfully to prevent McMullan's, McCurtin's, and McGinnis's statements from being admitted. Shinn was present during that hearing and thus aware of McGinnis's testimony. The Attorney General concedes Shinn never interviewed McGinnis and, when the prosecution did not call McGinnis, did not have McGinnis testify on Gay's behalf.

The referee concluded Deputy McGinnis's testimony "would have been helpful to petitioner." We agree. McGinnis's

testimony would have directly supported Gay's defense that Cummings was the sole shooter and fired the final shots into Officer Verna. And as a peace officer with no evident incentive to see the killer of a fellow officer escape punishment, McGinnis would have been among the most credible witnesses Gay could have called in support of his defense.

The referee thought the value of the statement was limited because Cummings's statement "was lacking in detail as to the identity of the shooter." In context, however, Cummings's statement is best understood as an acknowledgment that Cummings alone shot Officer Verna. Cummings made the statement in response to Deputy McGinnis's assertion that McGinnis, unlike Cummings, had never shot anyone in the back. Rather than deny that he had shot Officer Verna in the back (e.g., because it was Gay who had fired the final shots), Cummings justified doing so, explaining that Verna wouldn't have gotten shot in the back if he hadn't tried to run. Deputy McGinnis himself understood the statement in just this way. In a 2003 declaration, McGinnis said: "It was clear to me then as it is now that Cummings alone pulled the trigger and was the sole person responsible for killing Officer Verna." Had he been called at trial, McGinnis could have testified to his understanding of what Cummings meant.[9] We recognize that the form of Cummings's statement may not eliminate all possible ambiguity, but it would have been more than reasonable for the jury to interpret the statement as Deputy

---

[9] The Attorney General concedes that "[t]he context and substance of Cummings's admissions made 'clear to [Deputy McGinnis] . . . that Cummings alone pulled the trigger and was the sole person responsible for killing Officer Verna.' "

McGinnis did—as an admission of sole responsibility for the shooting.

The referee also concluded that testimony from Deputy McGinnis would have been "cumulative to the testimony of Michael McMullan and Rick [McCurtin]." But Deputy McGinnis was not a witness to confessions the jury had already heard about; his testimony would have detailed an entirely different occasion on which Cummings confessed, in a way that clearly supported the defense theory that Cummings was the sole shooter. Deputy McCurtin's testimony suffered from the difficulty that saying " 'we' " put four more in Officer Verna did not sound like an admission of sole responsibility for the shooting. (See *Cummings*, *supra*, 4 Cal.4th at p. 1266 & fn. 9, italics omitted.) Cummings's confession to McGinnis, in contrast, was understood by McGinnis as just such an admission. We can think of no tactical reason why competent counsel would, in a case where codefendants pointed the finger at each other for the murder of a law enforcement officer, pass up the opportunity to present testimony from a second peace officer that placed sole responsibility on the other defendant.

In 1984, Los Angeles Sheriff's Deputy Richard Nutt was tasked with escorting Cummings to the shower. According to the referee's findings, Cummings said to Nutt, " 'Hey Nutt. I killed Verna. He had about sixteen years on. When I get out of prison you will have about sixteen years on and I will kill you too.' " Nutt replied, " 'You're a coward. I know you shot Verna in the back. If you want to take a shot at me, do it to my face.' " Cummings did not respond. Deputy Nutt reported the exchange to his "supervisor, Sergeant George Arthur, who declined to take a formal report due to the number of similar comments made by Raynard Cummings to other Sheriff's personnel." Like Deputy

McGinnis, Sergeant Arthur was identified "in reports compiled by the investigating officers and provided to the defense in discovery materials."

There appears to be no dispute that as with Deputy McGinnis, Shinn never met, directly or indirectly, with Sergeant Arthur or Deputy Nutt. The referee found that "Nutt's testimony would not have been available to Shinn in 1985 as his contact with the persons accused [of] the killing of Officer Verna did not come to light until at or near the time of the 2000 retrial." Gay takes exception to this finding. He argues that had Shinn interviewed Sergeant Arthur, Nutt's supervisor, it is reasonably likely he would have learned of the exchange Deputy Nutt had with Cummings.

We decline to adopt the referee's finding that Deputy Nutt's testimony would have been unavailable to Shinn. True, "the duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." (*Rompilla v. Beard, supra,* 545 U.S. at p. 383.) But Nutt's testimony was discoverable with minimal effort. As the referee found, Nutt reported Cummings's confession to Sergeant Arthur. As the referee also found, Shinn was provided with Sergeant Arthur's name in discovery as a witness to Cummings's jailhouse confessions.

Gay was charged with the murder of a police officer. In such a case, peace officers would have had every incentive to ensure that those responsible were convicted. Exculpatory testimony from a peace officer would have been some of the most persuasive evidence a defense attorney could present. Through

discovery, Shinn was aware of evidence that Cummings freely confessed to the shooting. The professionally appropriate response to this information would have been to contact each peace officer mentioned as having had contact with Cummings—including Sergeant Arthur—to ask about any confessions they had witnessed or knew of and to solicit evidence that Cummings, alone, killed Officer Verna. Such an investigation would have, in all likelihood, uncovered Cummings's confession to Deputy Nutt.

The Attorney General argues that Deputy Nutt would have been readily impeached because he told homicide investigators in 2000 that it was Gay whom he escorted to the showers and who confessed to killing Officer Verna. The written report prepared by detectives who interviewed Nutt then does indicate the speaker was Kenneth Gay, but at the reference hearing Nutt identified a booking photo of Cummings and testified adamantly and at length, on direct and on cross-examination, that the detectives had misunderstood his statements as relating to Gay, whom he had never met. The referee credited this testimony and concluded it was Cummings who confessed to and threatened Nutt. The 2000 written report gives no reason to think Nutt, if called to testify at the 1985 trial, would have had any doubt it was Cummings with whom he spoke.

Shinn's defense of Gay relied in part on highlighting prosecution testimony that Cummings confessed to shooting Verna. Calling additional such witnesses, witnesses who could support the theory that Cummings alone shot Verna, would have been fully consistent with Shinn's strategy. Given the potential value of peace officer testimony, we can conceive no tactical reason why competent counsel would have declined to

investigate the availability of such witnesses and instead simply relied on whichever witnesses the prosecution chose to call. Shinn's performance in failing to investigate this line of defense was deficient. (See *In re Lucas*, *supra*, 33 Cal.4th at pp. 725–731.)

## D.

Taken alone, these deficiencies would be troubling enough. But the specific instances of Shinn's failure to competently pursue Gay's defense must be considered in their broader context—namely, the context of an attorney-client relationship poisoned at its root by fraud. As we explained in our previous opinion and discussed above, Shinn used deception to insinuate himself into the representation of Gay, who was originally represented by the public defender.[10] An earlier reference hearing established the following: " 'While Petitioner was in county jail in late June, 1983, Shinn and Marcus McBroom introduced themselves to Petitioner. McBroom identified himself as a minister and told Petitioner that he represented a group of black businessmen that wished to hire a lawyer for Petitioner. McBroom was an ordained minister. Both Shinn and McBroom encouraged Petitioner to retain Shinn. Petitioner said he had no money to retain counsel and Petitioner was told not to worry [because] this group of black businessmen would take care of Shinn's fee. [¶] Shinn never quoted a fee, was paid a fee, or attempted to collect a fee from the alleged

---

[10]    We did not ask the referee additional questions about this initial fraud; the relevant facts had already been established in an earlier reference hearing in connection with Gay's first habeas corpus petition. (See *Gay I*, *supra*, 19 Cal.4th at pp. 794–795.)

group of businessmen. [¶] There is no evidence to cause this Court to believe that there ever was any group of "black businessmen" to pay Shinn's retainer. Shinn later told Petitioner to tell the court that his parents had paid a retainer to Shinn. This was not accurate. Shinn never had any reasonable belief that he would be paid by any group of businessmen or Petitioner's family. Shinn's intent from early on was to seek appointment by the Court.'" (*Gay I*, *supra*, 19 Cal.4th at p. 794.) There were no exceptions to these findings, which were amply supported by the record, and we adopted them, concluding: "Shinn engineered both his initial retention and subsequent appointment by fraudulent means." (*Id.* at p. 795.)

Thus, from the very outset, Shinn showed himself willing to deceive Gay (and the court) to further his own personal ends. The duty of loyalty is "perhaps the most basic of counsel's duties." (*Strickland*, *supra*, 466 U.S. at p. 692.) Shinn's stunning breach of professional norms casts doubt on the usual assumption that counsel thereafter assumed and fulfilled this duty, acting in Gay's best interests and ensuring the prosecution's case would be subject to the requisite adversarial testing.[11] (See *Gay I*, *supra*, 19 Cal.4th at pp. 831–834 (conc. opn. of Werdegar, J.).)

---

[11] Recommending Shinn be disbarred on unrelated grounds several years later, the State Bar Court concluded "Shinn 'lacks basic understanding of the most fundamental responsibilities of an attorney as embodied in the provisions of the Business and Professions Code and the Rules of Professional Conduct.'" (*Gay I*, *supra*, 19 Cal.4th at p. 780, fn. 5, quoting *In the Matter of Shinn* (Review Dept. 1992) 2 Cal. State Bar Ct. Rptr. 96, 107.)

Our evaluation as to whether Gay's conviction was the product of a reliable proceeding also takes into account the referee's findings concerning a second potential conflict of interest. In an unrelated eminent domain action, Shinn obtained a judgment of nearly $200,000 for his clients Oscar and Marjorie Dane. The Danes refused to accept the funds, believing their property was worth substantially more. Although the trial court ordered Shinn to keep the funds in an interest-bearing trust account for the benefit of the Danes, Shinn failed to do so. He instead loaned $50,000 of these funds to one person, wrote a check for $2,000 to another, and used $70,000 to make restitution to a previous set of clients from whom he had misappropriated money, Alexander and Rebecca Korchin.

The Danes contacted the Major Frauds Division of the Los Angeles County District Attorney's Office to complain that the City of Santa Monica had stolen their home. Deputy District Attorney Albert MacKenzie and Los Angeles County Sheriff's Department Detective Charles Gibbons determined an eminent domain judgment had been entered but no money paid to the Danes. On March 1, 1984, after Shinn had begun representing Gay, MacKenzie and Detective Gibbons met with Shinn at the Criminal Courts Building in downtown Los Angeles and asked Shinn for an accounting of the Danes' funds. Eventually, in 1985, the Danes were persuaded to accept nearly $180,000 from Shinn. Had Shinn invested the Danes' funds in an interest-bearing account as the court had ordered, "the Danes would have received substantially more." MacKenzie declined to file criminal charges against Shinn and the case was closed in 1987. MacKenzie testified: " 'I could never reach a point where I had . . . what I considered . . . a provable embezzlement.' " Thus, throughout Gay's trial, Shinn was the subject of an open

investigation by the same prosecutor's office that was charging his client. He should have reported the investigation to Gay and to the trial court; there is no record that he ever did.

The right to the assistance of counsel secured by the Sixth Amendment to the federal Constitution and article I, section 15, of the California Constitution "includes the correlative right to representation free from any conflict of interest that undermines counsel's loyalty to his or her client." (*People v. Doolin* (2009) 45 Cal.4th 390, 417; see *Wood v. Georgia* (1981) 450 U.S. 261, 271.) Whether being the subject of an active embezzlement investigation created an actual conflict of interest and deprived Gay of his right to the effective assistance of counsel depends on "whether counsel 'pulled his punches,' i.e., whether counsel failed to represent defendant as vigorously as he might have, had there been no conflict" (*People v. Cox* (2003) 30 Cal.4th 916, 948) and whether Gay was prejudiced thereby (*Doolin*, at pp. 418–421).

The referee thought this unlikely. As the referee noted, the Los Angeles County District Attorney's Office is a massive office; the prosecutor who tried Gay's case was not acquainted with the prosecutor who investigated Shinn; and there is no indication that the trial prosecutor in this case was aware that Shinn was being investigated by another part of the district attorney's office. For these reasons, the referee concluded: "Whatever deficiencies or shortcomings may have resulted from Shinn's representation of petitioner during the 1985 guilt phase trial, none can be linked to the embezzlement investigation or characterized as an attempt to curry favor with the prosecutors."

We agree with the referee that the evidence establishes no firm link. And because Shinn was not available to testify at the reference hearing, we have no way to know to what extent his concerns about the embezzlement investigation may or may not have affected his performance in Gay's case. But given the history of the representation, we cannot entirely disregard the referee's underlying findings. (See *Gay I*, *supra*, 19 Cal.4th at p. 828 [the fraud at the inception of the relationship and the embezzlement investigation both "contribute to our lack of confidence in the verdict when considered with Shinn's other failings"].) Those findings establish that after committing fraud to obtain representation of Gay, Shinn was soon under considerable personal pressure to avoid prosecution by the same prosecutor's office and financial pressure from the looming need to make restitution to other clients. Shinn defaulted on his obligation to inform his client, as well as the court. Although we cannot definitively link Shinn's deficiencies and shortcomings to the pending embezzlement investigation, collectively the circumstances surrounding Shinn's representation of Gay reinforce our conclusion that Gay did not receive the benefit of the assistance of competent counsel loyal foremost to his interests.

## E.

To obtain relief, Gay must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, *supra*, 466 U.S. at p. 694; accord, *People v. Rices* (2017) 4 Cal.5th 49, 80; *Gay I*, *supra*, 19 Cal.4th at p. 790.) Where, as here, counsel's performance has been shown to be deficient in multiple respects, we do not consider

each error in isolation. We instead consider the cumulative impact of the errors on the fairness of the trial. (See *Gay I*, at p. 826.) How readily deficient performance undermines confidence in the trial's outcome will in part depend on the strength of the trial evidence on any decisive points. A "verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." (*Strickland*, at p. 696.)

An analysis of prejudice under *Strickland* does not involve the application of "mechanical rules." (*Strickland, supra*, 466 U.S. at p. 696.) Instead, "the ultimate focus . . . must be on the fundamental fairness of the proceeding whose result is being challenged. In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." (*Ibid.*) We have previously concluded that "the cumulative impact of Shinn's many failings," both his potential conflicts and his specific deficiencies at the penalty phase, undermined our faith in the jury's penalty verdict. (*Gay I, supra*, 19 Cal.4th at p. 826.) Today, considering the impact of specific additional instances of deficient performance in the light of those same conflicts and misfeasance, we conclude Shinn's many failings critically undermine our faith in the jury's guilt phase verdict as well.

We begin with Shinn's decision to advise Gay to confess to his involvement in a series of robberies, for no evident strategic reason and without a firm deal in place that would have prevented the prosecution from introducing the confessions against him at trial. (See *ante*, at pp. 16–18; *Gay I, supra*, 19 Cal.4th at pp. 791–792.) Examining the likely effect on the

sentence Gay received, we explained in *Gay I*: "The prejudicial impact at the penalty phase of the admission of petitioner's statement confessing to the robberies cannot be understated. Shinn not only acted as a second prosecutor by creating the evidence that led to petitioner's conviction of the robberies, his conduct permitted the prosecutor to portray petitioner as an admitted serial robber who killed a police officer to avoid arrest and prosecution for the robberies. That picture of defendant, absent any substantial mitigating evidence, would be devastating to any hope for a sentence less than death." (*Gay I*, at pp. 793–794.)

The effect at the guilt phase would likewise have been considerable. Among the robbery victims, only a single one identified Gay as a participant. (See *Cummings, supra*, 4 Cal.4th at pp. 1306–1311.) In the absence of Gay's confessions, the prosecution would have had to rely principally on the testimony of Pamela Cummings, who asserted Gay was a confederate (see *ibid.*) but was impeachable based on her incentive to minimize her own and her husband's culpability for the robberies, as well as her husband's involvement in the murder.[12] Instead, the prosecution was able to rely on Gay's own admission that he participated in the series of armed robberies, and to replace any doubt that Gay and Cummings acted as a team with certainty. (See *Gay I, supra*, 19 Cal.4th at p. 793 ["The statement Shinn misled petitioner into making, a stipulation that petitioner was a serial robber, made it unnecessary for the jury to grapple with the question of

_____

[12] The prosecution conceded the weakness of Pamela's testimony in closing argument, describing her as "not a completely honest witness by any stretch of the imagination."

corroboration [of Pamela Cummings]. The statement Shinn incompetently elicited from petitioner made the prosecution's case."].) The taped confessions, played for the jury, portrayed Gay through his own words as an active participant and a man of violence, someone who modified a knife's handle to improve its grip and make it easier to use, generally carried a gun, and even broke his .32-caliber handgun on the head of one unfortunate robbery victim.

In turn, that crime spree participation formed the centerpiece of the prosecution's argument that Gay also shot Officer Verna and that the shooting was premeditated. (See *Cummings, supra*, 4 Cal.4th at p. 1257; *Gay I, supra*, 19 Cal.4th at p. 827.) In closing argument, the prosecutor explained why Gay had a motive equal to Cummings. He speculated that Cummings and Gay surely would have had "conversations over a period of weeks when they are doing the robberies. [¶] If you are responsible for as many robberies as these men were, that subject has got to come up. [¶] 'What are we going to do if we run into the police?' Because now they were committing some [crimes] and the reason they have to discuss it is kind of logical. [¶] Maybe it is not something you spend any amount of time thinking about, but if you do it, it makes sense th[a]t they talk about it. Here's why. [¶] Two people doing these robberies. If one of them is going to violently resist the police and shoot his way out, the other one has to be willing to do the same thing. [¶] If one of them isn't going to do any shooting and he says, 'Oh, no. If the police get me, I am going to surrender,' [then] the other one has to do the same thing. [¶] They have to coordinate. [¶] It wouldn't make any sense for one of them to react one way and the other one to react the other way. [¶] Imagine the man says I am not going to shoot my way out, I am going to surrender,

turns to his partner and says, what are you going to do? [¶] He says, 'I am going to shoot my way out.' [¶] So in this case, they both decide to shoot." Describing Gay's motive, the prosecutor asked the jury to "[i]magine how worried you would be if you were responsible for 17 armed robberies in the Valley. You would probably be frantic about it." The murder was premeditated because "with all these robberies being committed, it is obvious that [Cummings and Gay] had to plan what their response would be, and in fact they killed Paul Verna in accordance with that plan."

True, "[t]he evidence of motive was not limited to evidence of the robberies of which Gay was convicted, but included evidence of the joint commission of another robbery, evidence that the car used by defendants was stolen, and evidence of parole violation." (*Cummings*, *supra*, 4 Cal.4th at p. 1324.) But even if the prosecutor could have argued about Gay's motive to escape law enforcement detection, the argument would have been considerably weaker had Gay not confessed to his role in the lengthy series of armed robberies of which the jury would later convict him. It is unsurprising, then, that the prosecution chose to place principal reliance on Gay's admission to committing the series of charged robberies with Cummings as the basis for its theory that Gay and Cummings agreed to shoot their way out rather than allow themselves to be captured.

Shinn's decision to have Gay meet with and confess to the prosecution had other collateral consequences. As part of the defense case, Shinn called Detective Holder to testify concerning Gay's interview. In the course of direct examination, Shinn elicited from Holder his belief that Gay was telling the truth when he confessed to the robberies but was lying as to the other matters discussed that day, i.e., participation in the Verna

murder. According to Holder, Detective Helvin and the prosecutor shared these views. (See *Cummings, supra,* 4 Cal.4th at pp. 1269, 1340.) Shinn thus exacerbated the impact of the confessions by putting before the jury evidence that any Gay denial of participation in shooting Officer Verna was a lie.

Moreover, by "falsely assuring [Gay] that the statement would not be admissible at trial" (*Gay I, supra,* 19 Cal.4th at p. 781), Shinn severely damaged the attorney-client relationship and Gay's ability to trust Shinn and assist in his ongoing defense. The court's ruling that the confessions could be admitted left Gay "believ[ing] that Shinn had not acted in Gay's best interest" and that "Shinn had deceived Gay" concerning discussions with the prosecution. (*Cummings, supra,* 4 Cal.4th at p. 1319.) Gay sought without success to dismiss Shinn. (*Cummings,* at pp. 1319–1321.) Thereafter, Gay was represented by an attorney in whom he could place little confidence.

In the absence of physical evidence, eyewitness testimony describing the shooting was central to each side's case. Alone among the witnesses at trial, Oscar Martin identified Cummings as the sole shooter. (*Cummings, supra,* 4 Cal.4th at p. 1259; see *id.* at pp. 1259–1263.) Had they testified, Ejinio and Irma Rodriguez could have provided testimony that also pointed to Cummings as the sole shooter.[13] Crucially, they also could have offered an explanation for why other eyewitnesses seemed

---

[13]    As discussed *ante* at pages 24 to 26, we find a reasonable probability competent counsel would have called both to testify. We thus must consider at the prejudice stage of our analysis what the impact of this testimony would have been. (See *Wiggins v. Smith, supra,* 539 U.S. at pp. 535–536.)

to think Gay had fired some of the shots. After the shooter got back in the car, both saw the car drive off but then return shortly and a second lighter skinned man in a lighter shirt (by inference, Gay) get out and retrieve a gun. Their testimony would have supported an argument that those who thought Gay was a shooter had indeed seen him outside the car, with a gun, near Verna, and thus erroneously inferred he had fired some of the shots. No witness at trial identified Cummings as the shooter and Gay getting out only after all the shots had been fired. In the absence of such testimony, Shinn was left to argue that the majority of eyewitnesses, who testified Gay fired the final shots, were simply mistaken. We have previously recognized Ejinio's and Irma's testimony would have "substantially bolstered" the theory that Gay was not a shooter when holding that the trial court erred in excluding it from the 2000 penalty retrial. (See *Gay II*, *supra*, 42 Cal.4th at p. 1224; see also *id.* at p. 1216.)[14]

The case that Cummings was the sole shooter would similarly have benefited from the testimony of peace officers who heard Cummings confess. The peace officers the prosecution called mostly described statements that could

---

[14] At oral argument, the Attorney General stressed that Ejinio and Irma were farther away from the shooting than prosecution witnesses such as Robert Thompson. But they were at the very same location as Shannon Roberts, and at a similar distance as Shequita Chamberlain and Rose Marie Perez, each of whom the prosecution called. Nor did closer eyewitnesses necessarily have a better vantage. Thompson, the closest witness, was on a ladder across the street facing away from the traffic stop. After the first shot, he testified he got down off the ladder, sought out a safe place, and only looked back after finding shrubbery to hide behind. Witnesses farther away were not impaired by the need to attend to personal safety.

equally point to Gay as a shooter. In particular, Deputy McCurtin testified that Cummings said after he initially shot Officer Verna, " '*we* put four more' " shots in him. (*Cummings*, *supra*, 4 Cal.4th at p. 1266.) Deputy LaCasella testified he "heard Cummings yell: 'You know how he got number six[,] don't you?' Gay then replied: 'Number six?' Cummings said 'yeh,' and then yelled: 'That's the one I put in the motherfucker.' " (*Ibid*.) These statements could constitute an admission that Cummings fired only one shot, "number 6"—the number assigned the gunshot wound from the very first shot by the deputy medical coroner who testified at trial (*id.* at p. 1267)—and that by his silence Gay admitted firing the remaining five shots. In closing argument, the prosecution urged exactly this interpretation.

Potential witnesses Deputy Nutt and Deputy McGinnis, in contrast, could have testified to statements that more clearly tended to exculpate Gay. (See *ante*, at pp. 26–31.) Deputy McGinnis's testimony was among that referenced when we criticized the trial court at Gay's penalty retrial for excluding "the far more powerful evidence that [Cummings] himself, on at least four occasions, had admitted firing all of the shots." (*Gay II*, *supra*, 42 Cal.4th at p. 1224.) The testimony of peace officers to confessions that implicated Cummings and exonerated Gay in the murder of a police officer is among the most compelling evidence Shinn could have had at his disposal, had he only investigated and developed it.

These deficiencies matter more because of the state of the record at trial. There was no physical evidence linking Gay to the shooting. (*Gay II*, *supra*, 42 Cal.4th at p. 1226.) Eyewitnesses' "versions of the events and identification of the shooter or shooters varied greatly." (*Cummings*, *supra*, 4

Cal.4th at p. 1259; see *Gay II*, at pp. 1226–1227.) Apart from discrepancies in the testimony of each eyewitness as compared with the testimony of the others, individual eyewitnesses told versions of events and made identifications that sometimes changed from the shooting's aftermath to lineups to the preliminary hearing to trial. (See *Cummings*, at pp. 1259–1263; *Gay II*, at pp. 1226–1227.)[15] The star witness against Gay, Pamela Cummings, had evident biases (*Gay II*, at p. 1227), was conceded by the prosecutor to be dishonest, and had originally tried to falsely implicate another man, Milton Cook, as the shooter until he turned up with an alibi (*id.* at pp. 1206–1207).

The Attorney General notes that we have had prior opportunities to grant Gay relief based on a claim of ineffective assistance of counsel at the guilt phase of his trial but have not yet done so. (See *Cummings*, *supra*, 4 Cal.4th at pp. 1339–1342; *Gay I*, *supra*, 19 Cal.4th at pp. 780, fn. 6, 781–782.) This is true, but it does not affect our evaluation of the claim he now raises. Gay did present a similar claim on direct appeal, but because he was unable to raise matters outside the record, that claim was necessarily incomplete. (See *Cummings*, at pp. 1341–1342 [denying relief based on the inadequacy of the record].) And although Gay raised a guilt phase ineffective assistance claim in his first habeas corpus petition, the presentation was likewise

---

[15] As one example, Robert Thompson identified the taller Black man in the backseat as the lone shooter when interviewed on the day of the shooting and was unable to identify Gay in a lineup shortly thereafter. Before a grand jury, Thompson repeated that the dark-skinned backseat passenger was the shooter. But then at the preliminary hearing and trial, Thompson positively identified Gay as the front-seat passenger who exited the car holding a gun.

incomplete, identifying some but not all of the deficiencies that we address today. In particular, that petition did not plead a claim that Shinn was deficient for failing to investigate and present testimony from Ejinio Rodriguez, Deputy William McGinnis, or Deputy Richard Nutt. Because Gay's earlier attempts to argue that he received the ineffective assistance of counsel at the guilt phase were raised on direct appeal and in a habeas corpus petition filed before our clarification of the limits on successive petitions (*In re Clark*, *supra*, 5 Cal.4th at pp. 767– 782), they do not bar relief on the more complete record he now presents (see *In re Robbins*, *supra*, 18 Cal.4th at p. 788, fn. 9; *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 267).

In light of both the specific deficiencies we have addressed and the deception at the inception of Shinn's representation, we cannot say Gay's murder conviction was the product of a trustworthy adversarial process. Defense counsel obtained appointment to represent Gay through fraud, counseled him to make damaging confessions to the prosecution without safeguards to ensure the confessions would not be used without a deal (while deceiving him as to whether such safeguards were in place), and failed to conduct a timely investigation into available testimony from eyewitnesses who would have exculpated Gay and peace officers who would have inculpated Gay's codefendant, Raynard Cummings. Counsel turned in this performance in a case where the evidence at trial left open a nontrivial possibility that his client bore no responsibility for the death of the victim. And given Shinn's manifest willingness to disregard fiduciary responsibilities, we cannot be entirely confident that even the other decisions challenged in the habeas corpus petition that might ordinarily fall within the very broad range of discretion we generally accord counsel were

uninfluenced by Shinn's readiness to place his own interests first and choose an easier, more personally beneficial path over the path that would best serve Gay.

It is not inconceivable that even with the assistance of competent counsel, the jury might still have voted for guilt. But "that is not the test." (*Rompilla v. Beard*, *supra*, 545 U.S. at p. 393.) Gay has shown "that counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable." (*Strickland*, *supra*, 466 U.S. at p. 687.) Defense counsel's multiple failings are, in combination, of sufficient gravity to overcome the strong presumption of reliability accorded final judgments and to undermine our ability to place faith in the jury's determination that Gay shot Officer Paul Verna. Gay has demonstrated prejudice.

## IV.

We conclude Gay has established entitlement to habeas corpus relief on his claim that he was denied the effective assistance of counsel at the guilt phase of his trial. We grant relief and vacate the judgment against Gay in Los Angeles County Superior Court Case No. A392702 insofar as it rests on Gay's conviction for first degree murder. The petition's remaining claims will be resolved by later order to be filed separately.

Upon finality of our opinion, the Clerk of the Supreme Court is to remit a certified copy of the opinion to the Los Angeles County Superior Court for filing, and respondent Attorney General is to serve a copy of the opinion on the prosecuting attorney.  (See Pen. Code, § 1382, subd. (a)(2).)

**KRUGER, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**GROBAN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** In re Gay
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding** XXX
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S130263
**Date Filed:** February 13, 2020
_____

**Court:** Superior
**County:** Los Angeles
**Judge:** L. Jeffrey Wiatt


_____

**Counsel:**

Gary D. Sowards, Jennifer Molayem, Patricia Daniels and Kimberly Dasilva for Petitioner Kenneth Earl Gay.

Lawrence J. Fox, George W. Crawford, Sadella D. Crawford; Drinker Biddle & Reath and Erin E. McCracken for Ethics Bureau at Yale as Amicus Curiae on behalf of Petitioner Kenneth Earl Gay.

Debevoise & Plimpton, Donald Francis Donovan, Stuart C. Naifeh, Ina C. Popova and Samantha J. Rowe for United Kingdom of Great Britain and Northern Ireland as Amici Curiae on behalf of Petitioner Kenneth Earl Gay.

Bill Lockyer, Edmund G. Brown, Jr., Kamala Harris and Xavier Becerra, Attorneys General, Robert R. Anderson, Dane R. Gillette and Gerald A. Engler, Chief Assistant Attorneys General, Pamela C. Hamanaka and Lance E. Winters, Assistant Attorneys General, Sharlene A. Honnaka, James William Bilderback and David F. Glassman, Deputy Attorneys General, for Respondent the State of California.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Gary D. Sowards
Habeas Corpus Resource Center
303 Secont St., Suite 400 South
San Francisco, CA 94107
(415) 348-3800

Lawrence J. Fox
Yale Law School
127 Wall Street
New Haven, CT 06511
(203) 432-9358

David F. Glassman
Deputy Attorney General
300 South Spring St., Suite 1702
Los Angeles, CA 90013
(213) 897-2355