Filed 5/26/23  P. v. Brown CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
## SECOND APPELLATE DISTRICT
## DIVISION FOUR

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JEFFERY BROWN et al.,<br><br>    Defendants and Appellants. | B309004<br><br>Los Angeles County<br>Super. Ct. No. TA147507 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Tammy Chung Ryu, Judge. Reversed in part, remanded with instructions.

Robert Booher, under appointment by the Court of Appeal, for Defendant and Appellant Jeffery Brown.

Stephen M. Hinkle for Defendant and Appellant Chayce Mitchell.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill, Shezad Thakor and Heidi Salerno, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

A jury found defendant and appellant Jeffery Brown guilty of one count of first degree attempted murder. It found defendant and appellant Chayce Mitchell guilty of three counts of first degree attempted murder. The jury also found gang, firearm, and great bodily injury allegations true with respect to both Brown and Mitchell ("appellants"). Appellants separately raise numerous contentions on appeal and join each other's arguments.

We agree with Brown that his conviction must be reversed because the jury was instructed it could convict him of attempted murder under the natural and probable consequences doctrine. After the trial, the Legislature codified the principle that the natural and probable consequences doctrine is no longer a viable theory of attempted murder liability. (Sen. Bill No. 775 (2021-2022 Reg. Sess.) ("SB 775") [amending Pen. Code,[1] § 1170.95, later renumbered to § 1172.6].) We therefore reverse the judgment as it pertains to Brown and remand to permit a retrial of Brown on a valid theory of attempted murder if the prosecution so elects.

We also agree with Mitchell that: (1) two of his attempted murder convictions must be reversed under *People v. Canizales* (2019) 7 Cal.5th 591 (*Canizales*); and (2) in light of Assembly Bill No. 333 (Stats. 2021, ch. 699) ("AB 333"), his case must be remanded for a new trial on the gang allegations. In all other respects, the judgment as it pertains to Mitchell is affirmed.

---

[1]     All undesignated statutory references are to the Penal Code.

## PROCEDURAL BACKGROUND

The Los Angeles County District Attorney filed an amended information charging appellants in counts one through four with attempted willful, deliberate and premeditated murder of four intended victims. (§§ 664/187, subd. (a).) With respect to both appellants, the information contained gang, firearm, and great bodily injury enhancements on all counts. (§§ 186.22, subd. (b)(1)(C), 12022.53, subds. (b), (c), (d), & (e)(1).) The court later dismissed count four on the prosecution's motion.

The jury convicted Brown on count one and acquitted him on counts two and three. It also found the attempted murder was premeditated and deliberate, was committed to benefit a criminal street gang, and that a principal fired a gun, causing great bodily injury. The jury found Mitchell guilty on all three counts and found all allegations pertaining to him true.

The trial court sentenced Brown to life in state prison with the possibility of parole on the attempted murder, plus 10 years for a gun enhancement (§ 12022.53, subd. (b)), and stayed a 10-year term on the gang enhancement. It sentenced Mitchell to 55 years to life in state prison, consisting of 15 years to life on count 1, a consecutive term of 15 years to life on count 2, and a consecutive term of 25 years to life for the section 12022.53, subdivision (d) gang enhancement on count 1.[2]

Appellants timely appealed.

---

2    The court imposed a concurrent sentence of 15 years to life on count 3.

# FACTUAL BACKGROUND

## A. Prosecution Evidence

### i.  Summary

Appellants Brown and Mitchell were East Coast Crip gang members who were enemies of Grape Street Crips. Grape Street Crips were allies with the Hat Gang Crips. One afternoon, appellants walked down an alley about 20 yards apart, carrying firearms into Hat Gang territory. They approached a party whose host was a Grape Street Crips associate and where other Grape Street members were present. Brown came up behind Wayne Givehand, a high-ranking Grape Street Crips member, said "Fake Street," intended as a disrespectful comment toward Grape Street, and pulled out a firearm. Givehand saw the gun, punched Brown, grabbed Brown's wrist above his hand holding the gun, and put him in a headlock. Mitchell shot Givehand in the lower back. Brown told Mitchell to get Givehand off him. Mitchell shot Givehand in the chest. Givehand ran away and Mitchell followed him, shooting him several more times. Mitchell also shot and wounded Dontae Pogues, John West Matthews, and another man near Givehand.

When police later arrested Mitchell, he was in possession of the gun that was used to shoot Givehand and the other victims. After being arrested, Mitchell and Brown both admitted to the police that they were in the alley the day of the shooting. They also made statements to one another at the police station suggesting consciousness of guilt, which officers recorded and played to the jury. Mitchell later made statements suggesting consciousness of guilt on a phone call with his girlfriend that was also recorded and played for the jury. Surveillance video captured

4

part of the shooting. A gang police officer who had encountered Mitchell on 20-30 prior occasions offered lay testimony to the jury that the video showed Mitchell was the shooter. A different gang officer who had made contact with Mitchell on 60 prior occasions offered the same testimony.

### ii.    The Shootings

On August 25, 2018, Tyna Johnson hosted a daytime birthday party for her son's first birthday on E. 92nd Street near Compton Avenue. There were 100 children and 60 to 80 adults in attendance. The party included a bouncy castle for the children. Johnson was an associate of the Grape Street Crips. Four Grape Street Crips members attended the party. One was Johnson's cousin, Givehand, who was a member of the Grape Street Crips gang. He was there with his four-year-old son. Givehand stood with his son next to his cousin near the alley, talking to other party guests. Givehand heard someone say "Fake Street," which Grape Street Crips members consider a derogatory term, and immediately respond to with violence. Hearing the term caused Givehand to turn. He saw Brown, who was wearing a hoodie, pull a gun out of his waistband. Givehand pushed his son out of the way, punched Brown in the chin, grabbed Brown's wrist above the hand holding the gun, put Brown in a chokehold, and tried to take his gun to prevent him from firing the weapon.

Appellant Mitchell shot Givehand in the back.[3] Givehand turned around and saw Mitchell in a hoodie with a gun. Brown

---

3    Although Givehand did not identify Mitchell and Brown in court, as mentioned above, the prosecution presented other evidence indicating Mitchell and Brown were the assailants, including surveillance video of the incident.

5

said, "Get him off of me." Givehand moved toward Mitchell, and let go of Brown, who fell to the ground. Givehand reached for Mitchell, but was too weak. Mitchell shot Givehand in the chest. Givehand hid behind a car where he fell over. He got up, ran, and again fell behind the side of the car. Mitchell stood over him. Mitchell attempted to shoot Givehand again but his gun jammed. Givehand kicked Mitchell, got up, and ran toward the backyard of the house where the children were. Mitchell pursued Givehand. Mitchell stood directly above another man, Givehand's cousin Darrell McNeely, and shot at him. McNeely got up and ran away. Givehand ran to the house and dove inside the door. Givehand then heard a total of six or seven shots before losing consciousness. He was shot three times. The bullets pierced his lung, and he lost one of his kidneys. As a result of his injuries, Givehand spent six months in the hospital.

Johnson heard five to six shots while she was at the neighbor's apartment complex. She saw a shooter, who she described as short,[4] run past her down the alley, and jump over the fence.

Another cousin of Johnson's, John West Matthews, was also at the party, hanging out in the back of the alley. When he heard gunshots and saw everyone run, he ran into the backyard. He heard seven shots and ran into the house. He went to his sister's house around the corner. When he got inside, his feet started tingling. He took off his shoe to discover his foot was bleeding and realized he had been shot.

Dontae Pogues, Johnson's uncle, was also at the party. He had lived with Johnson for 15 to 16 years and had moved out before the party. He had his back to the alley when he heard

---

4    Appellant Mitchell is five feet six inches tall.

6

shots. He grabbed two kids and ran toward the house. He looked back and saw two men in the alley. He was shot in the back of both heels and was unable to walk or run. He heard seven to eight gunshots. He went to the hospital and had surgery to remove one of the bullets.

### iii. Gun Evidence

At the scene of the shooting, police discovered four .22 caliber casings in the alley near a car. Forensic testing showed the .22 caliber casings had been fired from the Walther .22 recovered during appellant Mitchell's arrest. When the Walther .22 was tested, the empty cartridge did not eject properly as a semiautomatic weapon normally should, and failed to feed the next bullet into the chamber. For each shot, the criminalist had to manually pull back the slide to eject the cartridge to allow the magazine to feed into the chamber.

Surveillance videos on each end of the alley captured the shooting. In one of the videos, the gun misfired in the same manner Givehand described. The shooter used the slide to clear the malfunction. The video showed the shooter was left handed. Mitchell is left handed.

### iv. Gang Evidence and Identification of Appellants

As noted above, Grape Street Crips and Hat Gang Crips are allies. The alley behind Johnson's apartment was a Grape Street Crips hangout controlled by the Hat Gang. Grape Street Crips and East Coast Crips were "mortal enemies."

Givehand is an active member and lieutenant in the Grape Street Grips. A lieutenant is a leader who can make decisions and direct other gang members. Givehand had a "beef" with East Coast Crips because they did not like him. In a video, Givehand

rapped about the rivalry with East Coast Crips, making reference to killing East Coast Crip members and being shot. Matthews, one of the other men who was shot, had "GIP Ant" tattooed on his neck, which stood for "Grape In Peace," the Grape Street Crips way of saying rest in peace to his nephew named Ant. Matthews was a Grape Street affiliate, not a member, who earned the right to have a Grape Street Crips tattoo. Pogues claimed he was a former member of Grape Street Crips.

Police officers, who arrived within one to two minutes after a 911 call, saw a large crowd of people screaming and crying, and found Givehand in the living room of the house. Because the shooting took place in a gang area, only one or two people would talk the officers.

Officer Manuel Armenta, a gang enforcement officer, knew Mitchell and was familiar with Brown. He had made 20 to 30 contacts with Mitchell since April 2018. Many of his contacts were in Washington Park where East Coast Crips congregate; it is a stronghold of a subset known as 89 East Coast Crips. Officer Armenta observed Mitchell tagging "East Coast Crips" in Washington Park. Mitchell's moniker was C-Dog. Mitchell's gang tattoos included EC, for East Coast. Officer Armenta had made 10 to 15 contacts with Brown, which included detentions in Washington Park. Half of the time he made contact with Brown, Brown was with Mitchell. Brown's gang moniker was Tiny.

Officer Armenta opined that the shooter in the alley surveillance video was Mitchell. He based his opinion on the person's demeanor, mannerisms, walk, and when the hoodie fell off, a clear view of a face that Armenta believed matched Mitchell's face. Also, the shooter's hairstyle, body, build, stature, and skin color matched Mitchell's.

Gang expert Officer Hebert Ybanez testified that the East Coast Crips were a criminal street gang with primary activities consisting of narcotic sales, vandalism, robberies, burglaries, shootings, firearm possession, and homicides. Officer Ybanez believed appellants were East Coast Crips gang members, and he had contact with each of them around 60 times. Appellants were together 90 percent of the time he made contact with them.

Officer Ybanez testified gang members staggering their arrival 30 yards apart was a common tactic used by gangs in order to increase their chance of survival.[5] The first shooter would have a backup in case something went wrong.

On August 30, 2018, five days after the shooting, Officer Ybanez made contact with Mitchell and noticed his hands were scraped and had scabs. At the time, he did not have a "9" tattooed on his face. Officer Ybanez contacted Mitchell on September 10, 2018, and noticed that he recently had a "9" tattooed on his face and additional gang tattoos on his hands. Gang tattoos must be earned; one cannot decide to get one without committing crimes on behalf of the gang. The "9" tattoo was thus indicative that Mitchell had committed a new crime related to the gang.

Based on a hypothetical question involving facts similar to this case, Officer Ybanez opined that the crime would have been committed both in association and for the benefit of a criminal street gang.

Officer Ybanez also opined that the individual in the surveillance video walking down the alley in a hoodie was Brown, based on his mannerisms, walk, stature, and body type. He

---

5    Video evidence showed this was the manner in which Brown and Mitchell approached the party just before the shooting.

9

opined the second man walking down the alley 20 seconds later wearing a hoodie was Mitchell, based on his walk, body structure, and skin complexion. When the shooter's hoodie came off, Officer Ybanez recognized him as Mitchell.

### v. Arrest of Appellants

On October 11, 2018, the police stopped a stolen car that Mitchell was riding in as a passenger. The officers found a loaded .22 semiautomatic Walther handgun with a bullet in the chamber under the driver's side rear seat cushion. Mitchell had time between the police initiating the stop and the driver stopping to conceal the handgun under the rear cushion. The officers arrested Mitchell. At the jail, the police found a balled up piece of tinfoil inside his underwear. An officer asked him what it was and he told him, "Shells." The officer asked, "Did you say shells?" Mitchell responded, "I meant weed." The officer said, "I thought you said shells." Mitchell replied, "It's a new type of weed." The tinfoil contained seven .22 caliber rounds, which were the same brand as the ones in the handgun found in the car.

Based on matching the firearm to the Givehand shooting, on November 13, 2018, officers arrested appellants. Mitchell's phone contained photographs and videos relevant to the case and gang membership. One photo was of Mitchell with a handgun on his left hip. The gun was the same gun that he was arrested with and that was used in the shooting.

### vi. Detectives Interview Appellants; Jail House Recordings

After their arrest, appellants Mitchell and Brown admitted they were in the alley the day of the shooting. The detectives placed Brown on a bench outside Mitchell's jail cell where they

10

could not see each other but they could talk. Mitchell told Brown, "We wasn't even there . . . . They said that they just got us for investigation. They want us to sing, cuz [¶] . . . . [¶] It's not gonna happen." "Sing" meant tell on each other. Brown responded, "I'm not gonna [Unintelligible] [¶]. . . . [¶] I said I don't do R&B." "I don't do R&B" meant he would not tell. Mitchell said, "I think somebody's telling on us. He said we was on camera?" Brown responded, "Yeap." Mitchell said, "Please, please just don't— please don't say nothing. Don't say anything (unintelligible). Don't say nothing."

Brown admitted to the detectives that someone in the alley had choked him and said that could have been the reason Mitchell "busted," meaning shot, Givehand. The detectives interviewed Mitchell again, played that portion of Brown's interview, and placed him back near Brown. The following exchange occurred:

> [Mitchell]: So what they tell you? Huh? Huh? "Tiny"?[6]
> [Brown]: Yeah.
> [Mitchell]: So what they tell you?
> [Brown]: Didn't say [anything].
> [Mitchell]: So you taking the rap?
> [Brown]: Huh-uh.
> [Mitchell]: Huh?
> [Brown]: Hell, no.
> [Mitchell]: Oh. So you just gonna tell on me, huh?
> [Brown]: No. I ain't tell—telling on nothing. I (unintelligible).
> [Mitchell]: Huh?

_____

6    As noted above, Brown's moniker was Tiny.

[Brown]: Man, silence.

[Mitchell]: The what?

[Brown]: Silence is key.

[Mitchell]: Bro, they got—they just . . . showed me the voice recording [ ].

[Brown]: They showed you what?

[Mitchell]: The voice recording, . . . . You [said] "Oh, it could be."

[Brown]: [What] the [expletive] you talking about, . . . they said—[expletive] said—he said, "We got a video."

[Mitchell]: So he said, "So is that the reason—" So is that the reason why—why—why Chayce busted? You said, "It could be."

[Brown]: I said, "[Expletive]—"

[Mitchell]: Bro, I heard the voice recording, [expletive]. I heard the voice recording.

[Brown]: He said—he said—he said, I—I—I said, "It could be. I don't know."

[Mitchell]: Bro, you can't tell me nothing. You—you—you can't tell me nothing, bro. You can't. I just heard the voice recording, bro. He just told me that, bro. He told me everything, bro. He told me, "Yeah. Your homie just put you on all that, bro, all that."

[Brown]: I didn't put you on [expletive]—[expletive], you hear—that's crazy. Man, he said, is that the reason—"

[Mitchell]: Bro, bro, bro. He just—he—he just played the voice recording, bro. He talking about, [expletive], I'm not never getting out and he got all the evidence and my boy just ratted me out and this other [expletive].

[Brown]: [Expletive], (Unintelligible) that [expletive] don't mean anything.

[Mitchell]: So—so if I get washed, just know it's because of you.

[Brown]: [Expletive], it ain't because of me. On the dead homie, [expletive].[7]

[Mitchell]: Bro. [Expletive] just played the voice recording, bro. I'm not going for nothing nobody telling me right now, nothing. This [expletive] just played the voice recorder, the whole thing. [¶] . . . [¶] I heard you, bro. [¶] . . . [¶] Cuz said, [expletive], "So since you were getting choked out, is that the reason why Chayce turned around and bust?" And you said, "It could be." Instead of saying, "I don't know," you're saying, "It could be." That's crazy. [¶] . . . [¶] Now they talking about booking me for attempted murder. That's what he just said. . . .

Later, Mitchell said, "Bro, you better tell [them] I didn't do it, bro. Huh. You hear me?" Brown responded, "That's saying that I was who did it." After more conversation, Mitchell, said:

Can't believe you said that, bro. I can't believe it. I thought you already knew, like, everything, I don't know. I don't know. I don't know. I thought you already knew that. You in there telling them you coming from the weed shop. Bro. Then, you gonna say "It could be." Like, bro. Now, I'm worried, [expletive], bad, [expletive]. [¶] At first, I wasn't worried about shit. Now, I'm worried like a[n] [expletive]. Crip. I was just about to—me and Vanessa was just about to have a baby, hood. Man. All my plans go down the drain.

---

7    "Dead homie" means "I swear to God on this."

Man, I hope they release me at night, bro. [¶] . . . [¶] [Expletive], man. Man, what you said, it really got a [expletive] worried, bro. Dead homies. Just by what you said. Worried as [expletive], man. . . .

Mitchell then told someone in the jail cell, "Hey, Dep. [expletive] told on me. [¶] . . . [¶] This [expletive] told on me, bro. [Expletive]. He told on me. Oh, [expletive]. . . ."

After the detective told Mitchell how he believed the shooting occurred, Mitchell called his girlfriend Alexis from jail, which was recorded. He complained that Tiny had "slipped up" and "said some [expletive]" to detectives who "replayed it and then played it to" him, and now he was "facing attempted murder." He told her,

[T]he [expletive] that happened this time, bro, these [expletives] repeated the whole [expletive], bro. And this [expletive] is serious . . . . [I]f I go to court, [expletive], and they sentence me, . . . bro, Alexis, I'm not gonna see you for a long . . . time, bro, on hood. On my soul, bro. On my soul, I not gonna see you for a long [ ] time, bro.

Alexis replied, "I don't even know what to say. I don't even know why you went over there, bro. [¶]. . . [¶] you been making some dumbass decisions, [expletive]. . . ." After Alexis said that it probably was not that big of a deal and that the police were not going to keep him because they were "[messing] with your head like they usually do," Mitchell told her, "Well, they not [messing] with my head, [expletive]. They not [messing] with my head, bro. They told the whole story, [expletive]. They told the whole story, bro."

14

## B. Defense Evidence

Appellants rested without calling any witnesses or presenting any evidence on their behalf.

## DISCUSSION

## I. Brown's Attempted Murder Conviction Must Be Reversed Because the Jury Was Instructed It Could Convict Him under A Natural and Probable Consequences Theory[8]

Brown argues the trial court committed prejudicial error by instructing the jury it could convict him of attempted murder under the natural and probable consequences doctrine. The Attorney General agrees the trial court erred, but contends the error was harmless. We agree with Brown.

## A. Applicable Legal Principles

SB 775 took effect on January 1, 2022. Among other changes, SB 775 "[c]larifies that persons who were convicted of attempted murder . . . under . . . the natural and probable consequences doctrine are permitted the same relief as those persons convicted of murder under the same theories." (Sen. Bill No. 775 (2021-2022 Reg. Sess.) at § 1(a); see § 1172.6, subd. (a).) SB 775 also allows a defendant convicted of attempted murder based on the natural and probable consequences doctrine whose conviction is not final to "challenge on direct appeal the validity

---

8    Because Mitchell does not join this argument, the following analysis pertains only to Brown.

15

of that conviction based on the changes made to Sections 188 and 189 by Senate Bill 1437." (§ 1172.6, subd. (g).)[9]

## B. Background

After the close of evidence, Brown moved for a section 1118.1 dismissal in light of *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*), arguing that a first degree premeditated attempted murder can no longer be attributed to a non-shooter through a natural and probable consequences theory. The trial court denied the motion, concluding *Chiu* applied only to murder, not attempted murder.

The trial court instructed the jury on principles of aiding and abetting, natural and probable consequences, and attempted murder. It instructed the jury on the elements of aiding and abetting using CALCRIM No. 401. With respect to the natural and probable consequences doctrine, the court instructed the jury using CALCRIM No. 403.[10]

---

9      This provision was intended to supersede the California Supreme Court's holding that section 1172.6 (formerly 1170.95) petitions were the exclusive remedy for retroactive Senate Bill No. 1437 relief on nonfinal judgments. (*People v. Gentile* (2020) 10 Cal.5th 830, 853-859, superseded in part by SB 775 as explained in *People v. Hola* (2022) 77 Cal.App.5th 362, 370 (*Hola*).)

10      That instruction stated:

To prove that the defendant is guilty of willful, deliberate, and premeditated attempted murder, the people must prove that:

    1. The defendant is guilty of assault with a firearm;

During closing argument, the prosecutor argued Brown was guilty of attempted murder for having shown up in the alley with a gun, even if he did not fire it. The prosecution then made arguments concerning the natural and probable consequences doctrine, saying:

> But there's . . . another theory of liability that allows us to get to the same conclusion. And that's something called the natural and probable consequences theory. Again, this isn't something I wrote, ladies and gentlemen. This is the way the law is written. And it's the law that you

2. During the commission of assault with a firearm, a coparticipant in that assault with a firearm committed the crime of willful, deliberate, and premeditated attempted murder;

And

3. Under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of the willful, deliberate, and premeditated attempted murder was a natural and probable consequence of the commission of the assault with a firearm.

A *coparticipant* in a crime is the perpetrator or anyone who aided and abetted the perpetrator. It does not include a victim or innocent bystander.

A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence.

To decide whether crime a crime of willful, deliberate, and premeditated attempted murder was committed, please refer to the separate instructions I will give you on those crimes.

have to follow. But the defendant is guilty. And I'll move on to this next.

The prosecution then explained the doctrine:

[D]uring the commission of the assault, if a coparticipant, in this case defendant Mitchell, in that assault committed the crime of attempted murder and under all the circumstances a reasonable person in . . . defendant Brown's position would have known the commission of the attempted murder was a natural and probable consequence of the commission of him pulling out the firearm, then he too is guilty of the attempted murder.

Basically in short form what that means is that, knowing that he was pulling out a firearm in an area where there are rival gang members and knowing that he was going there to target these other individual gang members and knowing that in that situation pulling out a firearm – and we heard this from Officer Ybanez today. He said actually 100 percent of the time, if you pull out a firearm in that sort of scenario where you are in front of rival gang members, that will result in a shooting.

So knowing that and understanding that, defendant Brown, because the attempted murders that were later committed by defendant Mitchell, now a natural and probable consequence of him pulling out that firearm, by virtue of that theory, he too is now basically guilty of all those attempted murders as well.

The prosecution reiterated:

But the point is that, if you believe that all he's guilty of is the assault because all he actually did was pull out that firearm, he's still guilty of the attempted murders by virtue of this theory, this natural and probable consequence theory. Because Officer Ybanez told us, when you . . . arm yourself with a loaded firearm, you enter territory the way you do staggered, with a plan, on a mission, and say fake street to a lieutenant from Grape Street, you are asking for a shooting to take place. And that's why the natural and probable consequence theory comes into play in this case.

### C. Analysis

The parties agree, and we agree with the parties, that in light of SB 775, it was error to instruct the jury that it could convict Brown of attempted murder based on a natural and probable consequences theory of liability. (Sen. Bill No. 775 (2020-2021 Reg. Sess.) at § 1(a); see § 1172.6, subd. (a).) It is also clear under the plain language of the statute that Brown is entitled to SB 775's ameliorative benefits on direct appeal. (§ 1172.6, subd. (g) ["A person convicted of . . . attempted murder . . . whose conviction is not final may challenge on direct appeal the validity of that conviction based on the changes made to Sections 188 and 189 by Senate Bill 1437 . . . ."].) The question is whether the prosecution can sustain its burden of proving the instructional error was harmless beyond a reasonable doubt. (*People v. Aledamat* (2019) 8 Cal.5th 1, 3-4, citing *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) [17 L.Ed.2d 705, 87 S.Ct. 824].) We conclude it cannot.

Once a defendant has shown "the jury was instructed on correct and incorrect theories of liability, the presumption is that the error affected the judgment . . . ." (*In re Martinez* (2017) 3

19

Cal.5th 1216, 1224 (*Martinez*).) Applying this presumption, we must reverse unless we "conclude[ ] beyond a reasonable doubt that the jury actually relied on a legally valid theory in convicting the defendant . . . ." (*Id.* at p. 1218.)

In *Martinez*, the defendant was convicted of first degree murder after the jury was instructed on both direct aiding and abetting and natural and probable consequences theories of liability. (*Martinez, supra,* 3 Cal.5th at p. 1218.) After Martinez's conviction, the Supreme Court in *Chiu* held a natural and probable consequences theory of liability could no longer serve as a basis for a first degree murder conviction. (*Chiu, supra,* 59 Cal.4th at pp. 158-159.)[11] The *Martinez* court concluded the error in instructing the jury on correct and incorrect theories was prejudicial. (*Martinez, supra,* 3 Cal.5th at p. 1218.) In reaching this conclusion, the Supreme Court noted: "Although the Court of Appeal and the Attorney General may be correct that there is sufficient evidence to convict Martinez of directly aiding and abetting, the evidence also supports the theory that the murder was a natural and probable consequence of the assaults that Martinez and his codefendant committed." (*Id.* at p. 1226.) This analysis also applies here. Although the record perhaps contains sufficient evidence to convict Brown as a direct aider and abettor, the jury could have convicted on the now invalid alternate theory that the attempted murder was a natural and probable consequence of Brown's assault on Givehand.

---

[11]   SB 1437 later superseded *Chiu* to the extent that it upheld aider and abettor liability for second degree murder under the natural and probable consequences doctrine. (*People v. Lewis* (2021) 11 Cal.5th 952, 959, fn. 3.)

The *Martinez* court also found it significant that the prosecution argued the natural and probable consequences theory to the jury at length during closing argument. (*Martinez*, *supra*, 3 Cal.5th. at pp. 1226-1227.) The same happened here, and on this record, we cannot "rule out a reasonable possibility that the jury relied on the invalid natural and probable consequences theory" in convicting Brown of attempted murder. (*Id*. at p. 1226.) Stated differently, we cannot conclude beyond a reasonable doubt that the jury "actually relied on a legally valid theory in convicting [Brown] of first degree murder." (*Id*. at p. 1218.) We therefore vacate Brown's conviction. (*Ibid*.) The matter is remanded to the trial court to afford the prosecution the opportunity to advance a valid attempted murder theory at a new trial. (See *Hola*, *supra*, 77 Cal.App.5th at p. 370.)

Because we reverse the judgment as it pertains to Brown based on this instructional error, his remaining arguments are moot as they pertain to him. The rest of this opinion addresses arguments relating to Mitchell, including those raised directly by Mitchell and those raised by Brown but joined by Mitchell.

## II.     Mitchell's Kill Zone Argument

Mitchell contends his convictions for the attempted murder of Pogues and Matthews (counts two and three) must be reversed based on the Supreme Court's decision in *Canizales*. For the reasons discussed below, we agree.

### A. Relevant Proceedings

During discussion of appellants' section 1118.1 motion, Mitchell's trial counsel argued the kill zone was not applicable to the facts of this case. The Supreme Court had issued its ruling in *Canizales* three months earlier. The trial court stated the People

had to prove the defendants intended to kill the persons in the kill zone, and shooting into a crowd, without more, was insufficient. The People noted the surveillance video showed Mitchell continuing to shoot into the kill zone after Givehand had already fled and did so by moving his arm from side to side directing his weapon in a specific small area. The court found that the evidence of specific intent for the kill zone was sufficient to go to the jury.

During discussions on jury instructions, the court stated it would give CALCRIM No. 600. There was no further discussion or objection. At the time, the Judicial Council had not yet revised CALCRIM No. 600 in light of *Canizales*. The trial court ultimately instructed the jury on the kill zone using CALCRIM No. 600.

## B. Applicable Legal Principles

"To prove the crime of attempted murder, the prosecution must establish 'the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' [Citation.] When a single act is charged as an attempt on the lives of two or more persons, the intent to kill element must be examined independently as to each alleged attempted murder victim; an intent to kill cannot be 'transferred' from one attempted murder victim to another under the transferred intent doctrine." (*Canizales*, *supra*, 7 Cal.5th at p. 602.) "[T]he defendant must intend to kill the alleged victim, not someone else . . . . Someone who intends to kill only one person and attempts unsuccessfully to do so, is guilty of the attempted murder of the intended victim, but not of others." (*People v. Bland* (2002) 28 Cal.4th 313, 328 (*Bland*).)

While a defendant's intent to kill may not be transferred among victims, it may exist as to several victims simultaneously. This doctrine of concurrent intent is typically referred to as the kill zone theory. (*Canizales*, *supra*, 7 Cal.5th at p. 603.) Under that theory, the nature and scope of an attack directed at a primary or targeted victim "may raise an inference that the defendant "'intended to ensure harm to the primary victim by harming everyone in that victim's vicinity.'"" (*Id.* at p. 602.) It has long been clear that such an inference is appropriate in situations where a defendant uses an extreme amount of force to accomplish his or her goal of killing the primary victim. The classic examples are placing a bomb on a commercial aircraft on which the primary target is a passenger, or attacking a group containing the primary target with "'automatic weapon fire or an explosive device devastating enough to kill everyone in the group.'" (*Bland*, *supra*, 28 Cal.4th at p. 330.) Because the outer bounds of the doctrine remained undefined for some years, there was "potential for the misapplication of the kill zone theory" to cases where the inference was not proper. (*Canizales*, *supra*, 7 Cal.5th at p. 606.)

In *Canizales*, the Supreme Court clarified—and limited—the circumstances under which a prosecutor may use the kill zone theory. It held that the kill zone theory "may properly be applied only when a jury concludes: (1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm—that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death—around the primary target[;] and (2) the alleged attempted murder victim who was not the primary target was

located within that zone of harm." (*Canizales*, *supra*, 7 Cal.5th at p. 607.) Under this standard, the kill zone theory is not applicable where "'the defendant merely subjected persons near the primary target to lethal risk'"; conscious disregard of persons proximate to the intended target is insufficient to support application of the theory. (*Ibid.*) In an appropriate kill zone case, "'the defendant has a primary target and reasons [that] he cannot miss that intended target if he kills everyone in the area in which the target is located. In the absence of such evidence, the kill zone instruction should not be given.'" (*Ibid.*) Factors relevant to the defendant's intent to create a kill zone and the scope of such a zone include "the circumstances of the offense, such as the type of weapon used, the number of shots fired (where a firearm is used), the distance between the defendant and the alleged victims, and the proximity of the alleged victims to the primary target." (*Ibid.*) *Canizales* cautioned that "there will be relatively few cases in which the theory will be applicable and an instruction appropriate." (*Id.* at p. 608.)

### C. Analysis

We agree with Mitchell that his convictions for the attempted murder of Pogues and Matthews must be reversed in light of *Canizales*. As *Canizales* cautioned, "trial courts must be extremely careful in determining when to permit the jury to rely upon the kill zone theory." (*Canizales*, *supra*, 7 Cal.5th at p. 597.) "As past cases reveal, there is a substantial potential that the kill zone theory may be improperly applied, for instance, where a defendant acts with the intent to kill a primary target but with only conscious disregard of the risk that others may be seriously injured or killed." (*Ibid.*) "Accordingly, . . . trial courts should reserve the kill zone theory for instances in which there is

24

sufficient evidence from which the jury could find that the *only* reasonable inference is that the defendant intended to kill (not merely to endanger or harm) everyone in the zone of fatal harm." (*Ibid.*, italics in original.)

Applying these principles, we conclude the trial court erred by acceding to the prosecutor's request to instruct the jury on the kill zone theory. In arguing that the jury should be instructed on the kill zone theory, the prosecution emphasized that the surveillance video showed Mitchell moving his arm side to side and shooting at several people within a small area. In issuing its ruling, the trial court likewise stated there were "just a few people in the area of the kill zone at that time that the shots [we]re being fired." In our review of the surveillance video, however, we observe that although Mitchell is visible as he is shooting, the kill zone itself (i.e., the location of Pogues and Matthews as Mitchell is shooting) is not visible. It is therefore unclear from the video how big the kill zone is or where Pogues and Matthews are in relation to Givehand when Pogues and Matthews are shot by Mitchell.[12] Nor does the witness testimony provided at trial answer these questions. In short, we cannot conclude, based on the video evidence and trial testimony, that "there is sufficient evidence from which the jury could find that

---

12    Although the video does show Mitchell point the gun at and try to shoot an individual other than Givehand, the record reveals that other individual was Darrell McNeely. Because Mitchell was charged with the attempted murder of McNeely in count four, and because the People ultimately moved to dismiss that count, the video evidence of Mitchell trying to shoot McNeely has no bearing on issues relating to the different zone Mitchell shot at when he hit Pogues and Matthews and whether a kill zone instruction was warranted with respect to those shots.

the *only* reasonable inference is that the defendant intended to kill (not merely to endanger or harm) everyone in the zone of fatal harm." (*Canizalez*, *supra*, 7 Cal.5th at p. 597, italics in original.) On this record, therefore, we must conclude the trial court erred by instructing the jury on the kill zone theory. (*Ibid*.)

We also conclude the error was prejudicial. According to *Canizales*, the applicable inquiry is whether "there is a "'reasonable likelihood'" that the jury understood the kill zone theory in a legally impermissible manner." (*Canizales*, *supra*, 7 Cal.5th at p. 613.) In making this determination, the reviewing court considers "the instructions provided to the jury and counsel's argument to the jury." (*Ibid*.)

The parties agree, and we agree with the parties, that the kill zone instruction provided here was incomplete. It omitted language, which has since been added to CALCRIM No. 600, explaining "the People must prove that (1) the only reasonable conclusion from the defendant's use of lethal force, is that the defendant intended to create a kill zone [around a primary target]; and (2) [the alleged attempted-murder victim] was located within the kill zone." (See CALCRIM No. 600.) It also omitted a list of circumstances, which has since been added to CALCRIM No. 600, that jurors should consider "[i]n determining whether the defendant intended to create a 'kill zone' and the scope of such a zone[.]" (*Ibid*.) The instructions given here were deficient in a manner similar to the instructions the Supreme Court found deficient in *Canizales* – they did not adequately define the term kill zone or properly direct the jury to consider evidence regarding the circumstances of defendants' attack. (See *Canizales*, *supra*, 7 Cal.5th at p. 613.)

26

And here, as in *Canizales*, the prosecutor's closing argument aggravated the potential for confusion. (*Canizlaes*, *supra*, 7 Cal.5th at p. 613.) The prosecutor here argued "not only is [Mitchell] actually guilty of attempted murder of Mr. Givehand. But because of the kill zone theory, which says, if the defendant intended to kill Mr. Givehand which is clear from the video that he did – so . . . Mr. Mitchell intended to kill Mr. Givehand and everyone within that kill zone." She further argued: "He didn't need to know their name[s]. He didn't need to say, yes, I'm coming for you. He didn't need to point, the mere fact that he's spraying fire in a very close proximity at anyone that was moving falls within that kill zone [¶] . . . . [¶] So Mr. Mitchell is guilty of attempted murder of Mr. Givehand. That's clear and simple. He's also guilty of the attempted murder of Mr. Pogues and Mr. John West [Matthews] through this theory of the kill zone." It is reasonably likely that these arguments misled the jury to believe that the mere presence of Pogues and Matthews in an area where they could be fatally shot was sufficient to prove attempted murder liability under the kill zone theory.

In sum, the error was prejudicial because "there is a reasonable likelihood that the jury understood the kill zone instruction in a legally impermissible manner. The court's error in instructing on the factually unsupported kill zone theory, combined with the lack of any clear definition of the theory in the jury instructions, as well as the prosecutor's misleading argument, could reasonably have led the jury to believe that it could find that [Mitchell] intended to kill [Pogues and Matthews] . . . if [Mitchell] shot at [Givehand] knowing there was a substantial danger he would also hit [Pogues and Matthews]." (*Canizales*, *supra*, 7 Cal.5th at p. 614.) We therefore reverse

27

Mitchell's convictions on counts two and three for the attempted murder of Pogues and Mitchell.[13] Our conclusion does not affect Mitchell's conviction for the attempted murder of Givehand (count one).

### III. Arguments Concerning AB 333

#### A. Mitchell's Case is Remanded for A New Trial on the Gang Enhancements[14]

Mitchell and the Attorney General agree that, in light of AB 333, Mitchell's case must be remanded to the trial court for a new trial on the gang enhancements. We agree.

AB 333, which went into effect on January 1, 2022, "amend[ed] section 186.22 to require proof of additional elements to establish a gang enhancement." (*People v. Lopez* (2021) 73 Cal.App.5th 327, 343 (*Lopez*).) Among other things, AB 333 "altered the requirements for proving the 'pattern of criminal gang activity' necessary to establish the existence of a criminal street gang." (*Id.* at p. 345.) Prior to AB 333's enactment, "a 'pattern of criminal gang activity' mean[t] 'the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of [certain enumerated] offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more [persons].'" (*Lopez, supra,* at p. 345.) "[AB] 333

---

13    On remand, the prosecution may retry Mitchell on these counts.

14    Although Brown raises this same argument, because we reverse his judgment, the issue is moot as it pertains to him.

28

redefine[d] 'pattern of criminal gang activity' to require that the last of the predicate offenses 'occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed,' and that the predicate offenses 'were committed on separate occasions or by two or more members, the offenses commonly benefited a criminal street gang, and the common benefit of the offenses is more than reputational.' [Citation.] In addition, the currently charged offense cannot be used as a predicate offense under the amendments." (*Lopez*, *supra*, at p. 345; see § 186.22, subd. (e)(1).)

AB 333 also made several other changes to the definition of "criminal street gang," clarified the definition of "[t]o benefit, promote, further, or assist," and added a new provision to the Penal Code requiring the trial court, upon request, to bifurcate the guilt and gang enhancement allegation phases of the trial (i.e., newly-added § 1109). (See *Lopez*, *supra*, 73 Cal.App.5th at pp. 344-345; Stats. 2021, ch. 699, § 5 [adding § 1109].)

We agree with the parties that Mitchell is entitled to the benefit of AB 333's amendments to section 186.22 because his judgment is not yet final. (*People v. Tran* (2022) 13 Cal.5th 1169, 1206-1207 (*Tran*), citing *In re Estrada* (1965) 63 Cal.2d 740.) Mitchell's case is remanded to the trial court to give the People the opportunity to prove the gang allegations in light of the amendments to section 186.22.

### B. Supplemental Briefing Addressing *People v. Burgos*

After Brown and Mitchell filed their reply briefs, the Sixth District Court of Appeal decided *People v. Burgos* (2022) 77 Cal.App.5th 550 (*Burgos*), review granted July 13, 2022, S274743. Brown filed a request for leave to file supplemental

briefing in light of *Burgos*. We granted Brown's request and set a briefing schedule allowing the parties to further address the impact of *Burgos* on this appeal. Appellants both argue their convictions must be reversed in light of *Burgos*. Because we are reversing Brown's judgment based on the erroneous natural and probable consequences jury instruction, the following analysis pertains only to Mitchell. And because we are reversing Mitchell's convictions on counts two and three in light of *Canizales*, the following analysis relates only to his conviction on count one (the attempted murder of Givehand).

### 1. Penal Code section 1109, *Burgos*, and *People v. Ramirez*

AB 333 added section 1109, which requires, on the request of the accused, bifurcation of the gang enhancement from the substantive charge, and trial of the substantive charge first. *Burgos* concluded that section 1109 applies retroactively where, as here, the defendant's case was not yet final when AB 333 was enacted. (*Burgos, supra*, 77 Cal.App.5th at pp. 564-568; see *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1129-1131 (*Ramos*) [same].)[15] The *Burgos* court explained that section 1109 is ameliorative in that it, among other things, increases the possibility of acquittal, thus necessarily reducing possible punishment. (*Burgos, supra*, at p. 567.)

---

15    According to the case docket on the Supreme Court's website, review is pending in *Burgos* on the following issue: "Does the provision of Penal Code section 1109 governing the bifurcation at trial of gang enhancements from the substantive offense or offense apply retroactively to cases that are not yet final?"

Upon concluding defendants were entitled to the retroactive benefit of AB 333 and section 1109, *Burgos* turned to the question of prejudice. It began its analysis by expressing its opinion that not bifurcating the gang enhancements "likely constitute[d] 'structural error'" because "the nature of the proceeding would have been entirely different" absent the error. (*Burgos*, *supra*, 77 Cal.App.5th at p. 568.) Rather than holding the lack of bifurcation was structural error, however, the *Burgos* court instead concluded that, even assuming harmless error analysis applied, the error was prejudicial under both *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) and *Chapman*, *supra*, 386 U.S. at p. 24 (*Chapman*). (*Burgos*, *supra*, at pp. 568-569.) In concluding the error was prejudicial, the court noted various weaknesses in the prosecution's case relating to issues of identity and culpability, and concluded those weaknesses were likely bolstered by the evidence that defendants were gang members. (*Ibid*.)

Justice Elia dissented in *Burgos*, expressing his belief that section 1109 is not retroactive because it "is not an *ameliorative* statute within the meaning of the *Estrada* rule."[16] (*Burgos*, 77 Cal.App.5th at p. 569 (dis. opn. of Elia, J.), italics in original.) Five weeks after *Burgos* was decided, in *People v. Ramirez* (2022) 79 Cal.App.5th 48 (*Ramirez*), review granted Aug. 17, 2022, S275341, a different panel of the Sixth District Court of Appeal disagreed with the majority in *Burgos*, instead holding Justice Elia was correct that "section 1109 operates prospectively only, and [a] defendant is not entitled to retroactive application of the

---

16 Under the *Estrada* rule, courts presume that amendatory statutes which lessen punishment are intended to apply retroactively. (*In re Estrada* (1965) 63 Cal.2d 740, 744-745.)

31

bifurcation statute." (*Ramirez, supra,* 79 Cal.App.5th at p. 65, fn. omitted.)[17] In reaching this conclusion, *Ramirez* adopted Justice Elia's position that section 1109 is not ameliorative because it "'does not alter the punishment for an offense, make a lesser punishment possible, or change the elements of an offense or defense.'" (*Ramirez, supra,* at p. 65.)[18] Because *Ramirez* concluded section 1109 was not retroactive, it did not address whether the lack of bifurcation was harmless or what prejudice standard might apply assuming section 1109 did apply retroactively. (*Id.* at p. 65, fn. 5.)

## 2. Analysis

The parties disagree about whether section 1109 is retroactive. We need not decide that issue, however. Even assuming it is retroactive, we conclude the admission of gang evidence here with respect to Mitchell was harmless under *Watson.* (See *People v. Gonzalez* (2018) 5 Cal.5th 186, 195 ["We evaluate nonstructural state law error under the harmlessness standard set forth in *Watson* . . . ."]; *Ramos, supra,* 77 Cal.App.5th at p. 1131-1133 [applying *Watson* prejudice standard and concluding it was not reasonably probable defendant would have obtained a more favorable verdict had the gang enhancement been bifurcated].) When officers arrested Mitchell,

17     According to the Supreme Court case docket in *Ramirez,* the Supreme Court has granted review and deferred further action pending the resolution of *Burgos* or further order by the Court.

18     Division Three of this District has also held that section 1109 is not retroactive because it "does not reduce the punishment or narrow the scope of the application of the gang statute." (*People v. Perez* (2022) 78 Cal.App.5th 192, 207.)

he was in possession of the gun used to shoot Givehand and the other victims. He then admitted to the police that he had been in the alley the day of the shooting. He and Brown made statements to one another at the police station suggesting consciousness of guilt, and he made statements on a phone call with his girlfriend also suggesting consciousness of guilt, all of which were recorded and played for the jury. Additionally, the jury was shown surveillance video of Mitchell pointing his gun at Givehand and pulling the trigger. Officers Armenta and Ybanez, who had each previously encountered Mitchell dozens of times, opined to the jury that Mitchell was the shooter in the video based on prior encounters and his distinct characteristics.[19] On this record, Mitchell cannot demonstrate a reasonable probability that he would not have been convicted of the attempted murder of Givehand had the proceedings been bifurcated.[20] Indeed, even assuming *Chapman* applied, we would find the error harmless under that standard as well.

## IV. Mitchell's Other Gang Enhancement Arguments Are Moot

Mitchell raises two other arguments concerning his gang enhancements: (1) the trial court committed prejudicial

---

19    As discussed in greater detail below, we reject Mitchell's argument that the officers' lay opinion concerning Mitchell's identity as the shooter was inadmissible.

20    Additionally, as the Attorney General points out, some of the gang evidence introduced at trial was likely admissible to show motive. (See *Ramos, supra,* 77 Cal.App.5th at p. 1132; *Tran, supra,* 13 Cal.5th at p. 1208 ["We have held that gang evidence, even if not admitted to prove a gang enhancement, may still be relevant and admissible to prove other facts related to a crime."].)

instructional error regarding the enhancements; and (2) the court did not act with informed discretion when it sentenced him on the enhancements. Because we are remanding Mitchell's case to the trial court for a new trial on the enhancements, these arguments are moot.

## V. Mitchell's Other Evidentiary Arguments

Mitchell also contends the trial court prejudicially erred by allowing police officers to testify that appellants were the men depicted in the surveillance videos of the shooting and that a photograph depicted Mitchell holding the same weapon used in the shooting. We disagree. The trial court properly admitted the officers' identification of appellants as lay opinion testimony under Evidence Code section 800. And it properly admitted the identification of the gun as expert testimony under Evidence Code section 801.

### A. Relevant Proceedings

The People introduced identifications of appellants as the men on the video surveillance from the officers who had the most contact with them in the years leading up to the shooting. Counsel objected that the testimony called for a legal conclusion, constituted speculation, was out of the jury's purview, and was inadmissible under Evidence Code section 352. The court overruled the objection.

Officer Armenta noted that the big screen showing the video in court was farther away from him than when he had viewed the same video closer to him. He identified Mitchell as the second man who walked down the alley. Officer Armenta noted that when Mitchell turned the corner and his hoodie came off, there was a "clear view of his face." He also explained that he

could recognize Mitchell because the video showed his mannerisms, "hairstyle, the proportions of his body, [his] build, and [his] stature." Officer Ybanez viewed the video surveillance played in court and identified Brown as the first man in the hoodie to walk down the alley. He identified Mitchell as the second man in the hoodie to walk down the alley. He explained that on the big TV screen he was looking at it was not as clear, but close up on the computer screen, "you can clearly see [Mitchell's] face profile." He also explained that he recognized Mitchell's "very distinct walk," as well as his "body structure" and complexion.

The People sought to introduce evidence that Detective Pearce determined the gun shown in a photo with Mitchell taken on his cell phone after the shooting was the same gun the police found when they arrested him. Counsel objected that the testimony was prejudicial. The court overruled the objection, noting the testimony was "very probative." Detective Pearce testified that he believed the gun in the photograph was the same gun police found when they arrested him.

## B. Applicable Legal Principles

"A lay witness may offer opinion testimony if it is rationally based on the witness's perception and helpful to a clear understanding of the witness's testimony. (Evid. Code, § 800.)" (*People v. Leon* (2015) 61 Cal.4th 569, 601 (*Leon*).) "'[T]he identity of a person is a proper subject of nonexpert opinion . . . .'" (*Ibid.*) "Court of Appeal decisions have long upheld admission of testimony identifying defendants in surveillance footage or photographs." (*Ibid.*)

"'An expert may express an opinion on "a subject that is sufficiently beyond common experience that the opinion of an

expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) . . . .'" (*People v. Valencia* (2021) 11 Cal.5th 818, 831.)

We review the trial court's rulings for abuse of discretion. (*Leon, supra,* 61 Cal.4th 569 at p. 600.) We do not disturb the trial court's exercise of discretion on appeal unless it was exercised in "an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Jordan* (1986) 42 Cal.3d 308, 316.)

### C. **Analysis**

The trial court did not abuse its discretion in allowing the officers to offer lay opinion testimony identifying Mitchell in the video. *Leon* is instructive. The court in *Leon* held that because the officer was familiar with the defendant, his identification testimony was proper in that it was "based on his relevant personal knowledge and aided the jury[.]" (*Leon, supra,* 61 Cal.4th at p. 601.) In concluding the trial court did not abuse its discretion in allowing the officer's identification testimony, *Leon* also noted: "[B]ecause the surveillance video was played for the jury, jurors could make up their own minds about whether the person shown was defendant." (*Ibid.*) Here, as in *Leon,* the officers were able to identify Mitchell as the shooter in the video based on their personal knowledge (i.e., their numerous prior encounters with him). As the officers noted, the video showed the shooter's face, mannerisms, body type, distinct walk, and body proportions. And here, as in *Leon,* the jury could make up its own mind whether the person shown was Mitchell and how much weight to give the officers' testimony. We reject Mitchell's argument that the officers' testimony was inadmissible because it amounted to an opinion that Mitchell was guilty, thus infringing the jury's role as the exclusive finder of fact. As *Leon* makes clear,

the officers were allowed to offer opinion testimony that Mitchell was the shooter shown in the video.

We likewise reject Mitchell's contention that the trial court improperly admitted the expert testimony of the officer who identified the gun in the photograph as the one Mitchell was in possession of when he was arrested.[21] Experts may rely on photographic evidence that accurately depicts material evidence. (See, e.g., *People v. Bolin* (1998) 18 Cal.4th 297, 321-322.) The trial court properly exercised its discretion in allowing the officer to offer his opinion that the gun in the photograph was the same one the police found when they arrested Mitchell, and it was for the jury to decide how much weight to give that opinion. (See *ibid.*) Additionally, as the Attorney General points out, because the ballistics evidence linked the gun found in Mitchell's possession to the shooting, even assuming the trial court had erred, the purported error would be harmless under both *Watson* and *Chapman*.

---

21    Evidence Code section 801 provides: "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is:

(a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and

(b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion."

## VI.  Mitchell's *Dueñas* argument

The trial court imposed $120 in court security assessments (§ 1465.8, subd. (a)), $90 in criminal conviction assessments (Gov. Code, § 70373), a $300 restitution fine (§ 1202.4, subd. (b)(1)), and stayed a $300 parole revocation fine (§ 1202.45). Relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), Mitchell now challenges the assessments and fine.[22] Mitchell concedes he did not object to the imposition of the assessments or fine. Mitchell was sentenced 22 months after *Dueñas* was decided. Mitchell has forfeited his *Dueñas* argument by failing to object. (See *People v. Bipialaka* (2019) 34 Cal.App.5th 455, 464; *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153-1155.) He has also forfeited his argument that the section 1202.4 restitution fine violated the Eighth Amendment and California Constitution. (See, e.g., *People v. Benson* (1990) 52 Cal.3d 754, 786, fn. 7 [failure to object to alleged Eighth Amendment error forfeits issue on appeal].)

We also reject Mitchell's contention, raised in the alternative, that his counsel's failure to object constituted ineffective assistance of counsel. To establish ineffective assistance of counsel, an appellant bears the burden of showing prejudice, meaning a reasonable probability that but for the challenged act or omission of counsel, the appellant would have obtained a more favorable result. (*People v. Centeno* (2014) 60

---

22    Our Supreme Court has granted review in *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844, on the issue of whether a trial court must "consider a defendant's ability to pay before imposing or executing fines, fees, and assessments," and if so, "which party bears the burden of proof regarding defendant's inability to pay."

Cal.4th 659, 674-676; see also *In re Crew* (2011) 52 Cal.4th 126, 150 ["If a claim of ineffective assistance of counsel can be determined on the ground of lack of prejudice, a court need not decide whether counsel's performance was deficient"].) Although Mitchell suggests there is a reasonable probability he would have obtained a more favorable result, he identifies no support in the record for the assertion that the trial court would have found he lacked the ability to pay the fines and assessments. (Cf. *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1075-1076 [inability to pay costs of appointed counsel does not establish inability to pay restitution fine or other court-imposed fees].) Further, the court might have found him able to pay the fine and assessments from prison wages. (See *id.* at pp. 1075-1077 [any *Dueñas* error was harmless due to defendant's ability to earn prison wages equaling amount of fine and assessments]; *People v. Jones* (2019) 36 Cal.App.5th 1028, 1035 [same]; *People v. Johnson* (2019) 35 Cal.App.5th 134, 139-140 [same].) He therefore fails to satisfy his burden to show prejudice.

## VII. Mitchell's *Griffin*[23] Error Argument

Brown argues his trial counsel was prejudicially ineffective in failing to object when the prosecution committed *Griffin* error during closing argument. Brown takes issue with the following statement the prosecution made during rebuttal closing: "And I can promise you, if they were going to a fast food place, that would be something you would hear about." Brown contends the statement was improper because the jury could have interpreted it as remarking on the accused's failure to take the stand and

---

23    *Griffin v. California* (1965) 380 U.S. 609, 615, 14 L. Ed. 2d 106, 85 S. Ct. 1229 (*Griffin*).

deny guilt. Although Brown's argument is moot with respect to him, Mitchell joined Brown's argument. We therefore address the issue as it pertains to Mitchell and, as discussed in greater detail below, reject the argument because Mitchell cannot demonstrate prejudice.

### A. Procedural Background

During the initial closing argument, the prosecution stated:

> The other thing I want you to remember as we talk about the facts and the law in this case is why did the [appellants] choose to walk down this alley? Why did they choose to walk down this alley? We have no evidence of where they were going because you have all the evidence that's been presented to you. But we know that they chose to walk down this alley. We know who they are. And we know where this alley is. And we know who's there in the alley that day. So other than looking for trouble, other than setting up exactly what they were there to set up, why else did they choose to walk down the alley?

During closing argument, appellant Brown's counsel stated:

> . . . First, the D.A made a big deal asking the question what was Jeffrey Brown doing walking down the alley that day? And the answer is, well, he told Detective Pearce he was leaving a dispensary. If you look at the D.A.'s own map, Google map image, you can see a block away the map says Bud Shop. We all know what that means. It's at the corner of 91st and Compton Avenue on their own map. And you know what? The alley where they

were walking is in between that marijuana dispensary and the park.

The thing is you can't speculate [about] that, because they were walking through the alley, that they were going to get into trouble. They could have just [as] likely been walking through there to go to a fast food joint or a friend's house[¶]. . . .[¶] . . . It's ridiculous for the prosecution to say they don't belong there.

In rebuttal, the prosecution stated:

[T]here's no evidence or reason for [appellants] to be there. And I understand [counsel] got up here and said, we don't know if they were going to a fast food place or live in the area. There's no evidence of that. And I can promise you, if they were going to a fast food place, that would be something you would hear about. So that's not—you cannot speculate as to where they were going if there's no evidence of it.

We also know and it's an undisputed fact that the area they were in, that alley is in the opposite direction of their stronghold. There's no dispute that the park they usually hang out in is close by. It definitely is. And had they gone to that Bud Shop that's in that map, they could have very easily walked up to that area in the park by going up Compton or going up 90th or 89th. Why did they come down south and choose to walk through the alley that day? Why? Nobody can answer that question. Or at least [the] defense never answered that question.

It's undisputed that they were walking with their hoods up. I understand counsel said look at the trees. It's windy. It's also 87 degrees. So it's not going to be a cold wind. Why are you walking through that alley with your hoods up?

Also, if you are actually going to hang out because you just got some weed and you are going to go home and go to the fast food place and you're casually with your homie walking through the alley, why aren't you walking together? Because that would be reasonable. And that's what would make sense. Hey, Mr. Brown. Let's go walk through the alley. We're just walking through, cruising. Oh no. We got attacked. Why are you walking with your hoods up 30 seconds apart if you aren't planning an attack and if you aren't there for a reason.

### B. Relevant Law

"[T]he Fifth Amendment . . . forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." (*Griffin*, *supra*, 380 U.S. at p. 615, fn. omitted.) "The prosecutor's argument cannot refer to the absence of evidence that only the defendant's testimony could provide." (*People v. Brady* (2010) 50 Cal.4th 547, 565-566.) "The rule, however, does not extend to comments on the state of the evidence or on the failure of the defense to introduce material evidence or to call logical witnesses." (*Id.* at p. 566.)

"A defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion, and on the same ground, the defendant objected to the action and also requested that the jury be admonished to disregard the perceived impropriety."

(*People v. Thornton* (2007) 41 Cal.4th 391, 454.) "A defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel." (*People v. Lopez* (2008) 42 Cal.4th 960, 966.)

To succeed on a claim of ineffective assistance of counsel, the defendant must establish both: (1) counsel's performance was deficient because it fell below an objective standard of reasonable competence; and (2) prejudice resulted. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 694 [104 S.Ct. 2052, 80 L.Ed.2d 674]; *In re Welch* (2015) 61 Cal.4th 489, 514.) "'Surmounting *Strickland*'s high bar is never an easy task.']" (*Harrington v. Richter* (2011) 562 U.S. 86, 105 [131 S.Ct. 770, 178 L.Ed.2d 624].) To establish prejudice, the defendant must demonstrate "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" (*In re Gay* (2020) 8 Cal.5th 1059, 1086.)

### C. Analysis

Brown argues his counsel was prejudicially ineffective in failing to object to the following statement the prosecution made during rebuttal closing: "And I can promise you, if they were going to a fast food place, that would be something you would hear about." Brown contends the "prosecutor's comments here constituted classic *Griffin* error because 'the jury could have interpreted the prosecutor's remarks as commenting upon defendant's failure to take the stand and deny his guilt.'"

As mentioned above, because Mitchell joined the argument, and because the argument is moot with respect to Brown, our

43

analysis pertains only to Mitchell. Turning to Mitchell, we reject the contention that counsel was prejudicially ineffective in failing to object to the prosecution's rebuttal closing statement. Even assuming the prosecution's statement was *Griffin* error, and assuming counsel was deficient in failing to object, Mitchell cannot demonstrate prejudice. The evidence presented against him was strong. When officers arrested Mitchell, he was in possession of the gun used to shoot Givehand and the other victims. He then admitted to the police that he had been in the alley the day of the shooting. He and Brown made incriminating statements to one another at the police station, and he made incriminating statements on a phone call with his girlfriend, all of which were recorded and played for the jury. Officers Armenta and Ybanez offered lay opinion to the jury, based on numerous prior encounters, that Mitchell was the shooter in the surveillance video. In short, Mitchell cannot sustain his burden of demonstrating a reasonable probability that the results of the proceedings would have been different had counsel objected. (See *In re Gay, supra,* 8 Cal.5th at p. 1086.)

## DISPOSITION

The judgment as it pertains to Brown is reversed, and the true findings on all allegations relating to him are vacated. Mitchell's attempted murder convictions on counts two and three are reversed, and the true findings on the allegations attached to those counts are vacated. The true findings on all gang-related allegations pertaining to Mitchell on count one (i.e., §§ 186.22, subd. (b)(1)(C) & 12022.53, subd. (e)(1)) are also vacated in light of AB 333. In all other respects, the judgment as it pertains to Mitchell is affirmed. The prosecution may elect to retry Brown and Mitchell on all counts and allegations reversed and vacated in this opinion.

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

CURREY, Acting P. J.

We concur:

COLLINS, J.

DAUM, J.*

---

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to Article VI, section 6, of the California Constitution.